**NOBLE SECURITY, INC., Noble Locks Enterprises, Inc., and Tzong–Hsiung Huang, Counterclaim Plaintiffs,**

v.

**MIZ ENGINEERING, LTD., Counterclaim Defendant.**

**Noble Security, Inc., Third Party Plaintiff,**

v.

**Jane Ratto, Penelope Kane, Germain de Martinis, J.R. Marketing, LLC d/b/a Royal Locks, Inc., and Chien–Chi Lu a/k/a Francisco Lu, Third Party Defendants.**

**Civil Action No. 2:05cv722.**

United States District Court, E.D. Virginia, Norfolk Division.

April 14, 2009.

516

Daniel L. Grubb, for Counter Defendants, MIZ Engineering, Ltd. and Chien–Chih Lu.

Max Moskowitz, for Counter Claimant, Noble Locks Enterprises, Inc. and Noble Security, Inc.

Cameron S. Reuber, for Counter Claimant, Noble Locks Enterprises, Inc., Noble Security, Inc. and Tzong–Hsiung Huang.

Stephen A. Horvath, for Third Party Defendants, Jane Ratto, Penelope Kane, Germain DeMartinis and J.R. Marketing, LLC.

## OPINION AND ORDER

MARK S. DAVIS, District Judge.

This matter is before the Court on motions to dismiss for lack of personal jurisdiction filed by third party defendants Jane Ratto ("Ratto"), Penelope Kane ("Kane"), Germain De Martinis ("De Martinis"), and J.R. Marketing, LLC d/b/a Royal Locks, Inc. ("JRM" or "Royal Locks"). Oral argument has taken place, and the motions are now ripe for decision.

The Court notes at the outset that, during oral argument, counsel for the third party plaintiff, Noble Security, Inc. ("Noble"), agreed to the dismissal of De Martinis from this suit. Accordingly, the claims against De Martinis are **DISMISSED.** Therefore, only Ratto, Kane, and JRM are collectively referred to as "Third Party Defendants." [1]

### I. Factual and Procedural History

According to the factual allegations, Noble purchases fully-assembled computer locks from Guan Gao Co., d/b/a Polox Co., Ltd. ("Polox"), who assembles the lock components after it purchases them from manufacturer Ming–Yi Technology Co. ("Ming–Yi"). Ming–Yi produces the lock components pursuant to a United States patent, specifically U.S. Patent No. 5,626,-203 ("the '203 patent"). (Noble Supp. Brief, Docket No. 166 at 2.)

---

**1.** When the Court refers to *all* of the third party defendants, the reference will be in low-ercase letters: "third party defendants."

One of Ming–Yi's principals is Tzong–Hsiung Huang. Huang is allegedly the inventor of the '203 patent and a former business partner of Chien–Chih Lu (a/k/a Francisco Lu), who owns MIZ Engineering, LTD ("MIZ"), a Taiwanese company.[2] Huang assigned the '203 patent to the Ming–Yi partnership in the early 1990s. However, MIZ claims to own the '203 patent via several assignments. Noble denies that MIZ is a valid assignee of the patent and asserts that MIZ's rights to the patent were obtained fraudulently.

Ratto, Kane, and DeMartinis allegedly worked for Noble and its related entities and essentially ran Noble's operations. Noble alleges that Ratto, Kane, and De-Martinis stopped working for Noble and formed their own company, JRM, to compete with Noble. These third party defendants allegedly began purchasing the computer locks at issue from MIZ, but also allegedly secretly conspired with MIZ and executed a plan to harm Noble and steal its computer lock business. The conspirators allegedly used MIZ's counsel, who had offices in Virginia and Washington, D.C., not only to file suit against Noble in Virginia, but also to write to and telephone certain Noble customers, making various misrepresentations that Noble's product infringed on the MIZ patent. The customers were purportedly told that they should purchase locks from JRM to avoid legal trouble involving the disputed patent.

The Third Party Defendants allegedly also provided information to MIZ and/or its counsel, including Noble's customer information, in furtherance of the conspiracy. Noble claims that the conspirators successfully harmed its business, that a corresponding sales reduction occurred, and that some of Noble's customers began purchasing locks from JRM.

MIZ, a Taiwanese corporation, filed its Complaint in this Court on December 8, 2005, seeking to enforce its alleged patent rights against Noble, a California corporation, and related entities.[3] Noble, among others, then filed a Counterclaim against MIZ. Noble, the sole third party plaintiff, subsequently sought leave of court to assert claims against third parties Ratto, Kane, De Martinis, JRM, and Chien–Chih Lu (a/k/a Francisco Lu). Leave was granted by the Court on September 29, 2006, and Noble's Third Party Complaint was filed. The Third Party Complaint contains a number of civil causes of action against Ratto, Kane, De Martinis, and JRM. There are two federal causes of action: 1) Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy in violation of 18 U.S.C. § 1962 et seq., and 2) unfair competition in violation of 15 U.S.C. § 1125(a) (Lanham Act), and five Virginia causes of action: 1) tortious interference with business relations, 2) tortious interference with prospective business relations, 3) defamation and trade libel, 4)

---

**2.** Noble's counsel has represented that Tzong–Hsiung Huang is the inventor of the '203 patent. (Noble Supp. Brief, Docket No. 166 at 2.) During oral argument, a chart was given to the Court by Noble's counsel for purposes of outlining the relationships between the parties. However, the chart was not submitted as evidence, and therefore was not filed in the record. The chart indicates that "Chyuan Huang" is the inventor of the patent. A September 29, 2006 Opinion, by the Judge to whom this case was previously assigned, references "Tzong–Chyuan Huang" as the inventor of the patent. (Opinion, Sept. 29, 2006, Docket No. 59 at 2.) For purposes of these motions, it was not necessary for the Court to determine who actually invented the '203 patent, but the Court nevertheless notes these discrepancies.

**3.** The case was originally assigned to United States District Judge Walter D. Kelley, Jr. However, Judge Kelley resigned his commission on May 16, 2008, and this matter was later assigned to the undersigned.

common law misappropriation and unfair competition, and 5) Virginia business conspiracy in violation of Va.Code § 18.2–499.

Counterclaim defendant MIZ, and third party defendant Lu have filed Answers. However, third party defendants Ratto, Kane, De Martinis, and JRM filed Answers concurrently with several motions to dismiss on October 30, 2006. Plaintiff MIZ eventually dismissed all of its claims with prejudice. In a September 28, 2007 Opinion and Order, Judge Kelley disposed of all of the motions to dismiss, with the exception of these motions to dismiss for lack of personal jurisdiction filed by Ratto, Kane, De Martinis and JRM. (Order, Sept. 28, 2007, Docket No. 146 at 17.) The Court permitted the parties to conduct limited discovery concerning personal jurisdiction, and because that discovery was ongoing, the Court advised the parties that it would address the motions to dismiss for lack of personal jurisdiction at a later time. Subsequently, with the hope of facilitating settlement, Judge Kelley apparently stopped further proceedings pending the outcome of a related case being litigated by many of the same parties in California. *See Avganim v. Ratto,* Case No. CV054204 (Cal.App. Dep't Super. Ct.). A jury has now rendered a verdict in the California litigation. However, no settlement has taken place in this case, and the parties wish to go forward with this litigation.

Third Party Defendants assert that they should not be subject to the personal jurisdiction of this Court because they do not have sufficient contacts with Virginia to make long-arm jurisdiction appropriate. For purposes of these jurisdictional motions alone, the Court finds that the following pertinent facts have been established, and the parties do not specifically disagree with them:

- Ratto and Kane are California residents, and JRM is a California limited liability company.
- Ratto and Kane own no property in Virginia.
- JRM has no officers, directors, or employees, in Virginia, has paid no Virginia taxes, and has never sought a Virginia business license.
- Ratto and Kane have visited Virginia only one time in their lives, which they allege was in connection with this litigation.
- During their visit to Virginia, Ratto and Kane met with MIZ's counsel, the law firm of Dunlap, Grubb & Weaver ("the Dunlap law firm"), in Virginia, and discussed "agreements and things."
- Although Ratto and Kane have both submitted affidavits stating that they do not personally transact business in Virginia, one of the Noble entities that Ratto and Kane previously either worked for or owned (their status is disputed) shows significant sales to Virginia.
- JRM itself has had only three small sales in Virginia, which, in a related case, Judge Kelley found insufficient to subject JRM to the general personal jurisdiction of this Court. *Hartford Casualty Ins. Co. v. JR Marketing, LLC,* 511 F.Supp.2d 644 (E.D.Va. 2007).
- JRM and MIZ entered into a licensing agreement with Virginia choice of law and choice of forum provisions. As part of the licensing agreement, JRM agreed to give MIZ certain information concerning some Noble entities and owners.

In addition to the facts presented above, Noble has made numerous allegations which are disputed by the Third Party

Defendants. The parties agreed amongst themselves to submit briefs, with exhibits attached as evidence, including affidavits, deposition testimony, invoices, emails, and agreements, for the Court's consideration. Due to the stipulations by the parties as to how the Court should consider this information, as addressed below, the Court has reviewed all of this material and considered it as if an evidentiary hearing had occurred. (Hr'g Tr. 13–16, April 1, 2009, Docket No. 180). A credibility determination was not necessary.

The evidentiary standard applied by a court is typically dictated by whether an evidentiary hearing is held on such a personal jurisdiction challenge. The parties have stipulated that the Court should consider the record as if an evidentiary hearing had taken place and apply the preponderance of the evidence standard. Having done so, as further explained below, the Court finds, for purposes of these jurisdictional motions only, that Noble has *not* provided evidence supporting the following allegations:

- MIZ and the Third Party Defendants conspired to harm *Noble* and steal *Noble's* business through unfair competition.
- Thomas Dunlap ("Dunlap"), a partner with the Dunlap law firm who filed the Complaint in this case, contacted various *Noble* customers, outlining the lawsuit, requesting that customers discontinue purchasing locks from *Noble* and instead purchase locks from Third Party Defendants.
- Dunlap acted as a MIZ sales representative for at least one potential customer and sought to convince such customer to discontinue purchasing locks from *Noble* and instead purchase the MIZ locks from JRM.

The above disputed allegations were considered by the Court in its review of the evidence and analysis of personal jurisdiction, although they were not ultimately established as facts for purposes of these jurisdictional motions, primarily because Noble failed to provide even the most basic information reflecting that it, rather than other entities, was the target of the alleged conspiracy.

The Court has analyzed below the various contacts to determine whether personal jurisdiction over the Third Party Defendants is appropriate. However, before doing so, the Court must comment on the presentation of the case. As noted above, the major challenge in this case is determining whether the third party plaintiff was the target of the alleged conspiracy. Noble itself is a counterclaim plaintiff and the only third party plaintiff. However, there are a number of entities referenced by the parties, many of which have similar names (most of which include "Noble" somewhere in the entity name). The Noble entities are businesses owned and managed by Meir Avganim and/or several of his relatives. No facts have been presented regarding any relationships between the entities, such as whether one entity is a subsidiary, parent, or agent of another, or has a right in some capacity to represent or act for another.

Complicating matters further, Noble has not clearly distinguished between the various Noble entities when making its various allegations and arguments, which has not helped Noble in satisfying its burden to show that personal jurisdiction under the Virginia long-arm statute is appropriate here. Even Noble's own submissions and arguments have contained contradictory statements. For example, Noble has asserted that it and related companies have distributed a computer lock called the "axial pin tumbler lock" to businesses in the United States since 1996. (Noble Supp. Brief, Docket No. 166 at 2.) However, No-

ble, the only third party plaintiff, was apparently not formed until 2003. (Hr'g Tr. 52, Dec 1, 2008, Docket No. 177.) Therefore, it would be impossible for Noble to have distributed the locks since 1996. The Court assumes that some other Noble entity distributed locks since 1996, but Noble has failed to establish such basic facts.

After reviewing the briefs submitted by the parties and conducting oral argument regarding Noble's assertion of personal jurisdiction pursuant to the Virginia long-arm statute, the Court realized that such briefs and argument did not address the implications of *ESAB Group, Inc. v. Centricut, Inc.,* 126 F.3d 617 (4th Cir.1997) on personal jurisdiction over the Third Party Defendants under the RICO count. Therefore on March 30, 2009, the Court entered an Order directing that the parties review the case and address such issues during an on-the-record telephonic hearing. Such hearing took place on April 1, 2009. Noble argued that the Third Party Defendants were subject to personal jurisdiction of this Court by virtue of the nationwide service of process provision of RICO and the pendent personal jurisdiction that applies to the remaining claims. The Third Party Defendants argued that the RICO service of process provision did not subject them to this Court's personal jurisdiction. After lengthy argument, the parties disclaimed any desire to file supplemental briefs and indicated they would rely on their oral arguments. The Court held another on-the-record telephonic hearing on April 6, 2009 as a result of receiving an April 2, 2009 letter from counsel for Noble reasserting a prior suggestion that the Court should consider certain documents submitted by Noble after the December oral argument.

Because Noble asserts personal jurisdiction based upon Virginia's long-arm statute and based upon the nationwide service of process provision in the RICO statute, and because any future absence of the RICO claim might require consideration of the remaining assertion of personal jurisdiction under the long-arm statute, the Court will address both arguments.

## II. Discussion

### A. Standard of review regarding long-arm jurisdiction

■■■ This case comes before the Court in a unique procedural posture as a result of the actions and stipulations of the parties. On a defendant's motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the burden is on the plaintiff to prove the grounds of jurisdiction by a preponderance of the evidence. *Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 59–60 (4th Cir.1993); *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989). However, normally when a district court considers a Rule 12(b)(2) motion on the basis of papers alone without conducting an evidentiary hearing or without deferring ruling pending receipt at trial of the relevant jurisdictional evidence, the plaintiff must only prove a prima facie case of personal jurisdiction. *See In re Celotex Corp.,* 124 F.3d 619, 628 (4th Cir.1997); *Brooks v. Motsenbocker Advanced Devs., Inc.,* 242 Fed. Appx. 889 (4th Cir.2007 unpublished per curiam).[4]

4. It is worth noting that in *Brooks,* the Fourth Circuit vacated the district court's opinion utilizing the preponderance of the evidence standard and ruling based only on the "motion papers." 242 Fed.Appx. at 890. This case is distinguishable from *Brooks.* There, the jurisdictional facts were disputed by conflicting sworn documents, which would have required a credibility determination. No evidentiary hearing was held and the court did not defer the jurisdictional ruling until evidence was presented at trial. *Id.* The district court required the plaintiff to prove jurisdiction by a preponderance of the evidence on

■ In this case, no evidentiary hearing was conducted to determine whether personal jurisdiction exists, although the parties were permitted to conduct limited discovery regarding personal jurisdiction. Both parties attached to their briefs various documents, including affidavits and excerpts of deposition testimony which appear to be from the California litigation, as well as numerous invoices, emails, and agreements. During the initial oral argument, the Court noted that no witnesses were present and asked whether any evidence would be presented. Counsel for the Third Party Defendants responded that the parties are "relying on the papers and documents that have been submitted, the affidavits that have been submitted by the parties," all of which were attached to the supplemental briefs. (Hr'g Tr. 2, Dec 1, 2008, Docket No. 177.) Counsel for Noble, the party with the burden on the motions, never presented testimony at the hearing, and never disputed the representation of counsel for the Third Party Defendants that both parties were "relying on the papers and documents that have been submitted, the affidavits that have been submitted by the parties." (*Id.*) More importantly, counsel for both Noble and the Third Party Defendants agreed during oral argument that the proper standard the Court must use in reviewing the evidence is the preponderance of the evidence standard, not the prima facie standard.[5] (*Id.* at 12:3–4, 62:13–14.) This issue was again discussed during the April 1, 2009 telephonic hearing, and the parties explicitly reiterated their desire that this Court apply the evidentiary hearing preponderance of the evidence standard. (Hr'g Tr. 13–16, April 1, 2009, Docket No. 180.) On that basis, the Court finds that counsel for each of the parties has stipulated that all documents presented to the Court as attachments to the briefs are properly before the Court and may be considered as evidence for the determination of personal jurisdiction just as if an evidentiary hearing had been held.[6]

the basis of the motion papers alone. *Id.* The Fourth Circuit held that "because the jurisdictional facts were disputed by conflicting sworn documents, the court should have either resolved the issue in a separate evidentiary hearing or deferred ruling pending receipt at trial of evidence relevant to jurisdiction." *Id.* Here, however, there are no conflicting sworn documents, and no credibility determination is necessary. In addition, as discussed further below, the Court has applied the preponderance of the evidence standard because the parties explicitly stipulated to its application.

5. To the extent that the argument could be made that the proper standard in this procedural context is a mere prima facie standard, Noble waived any such argument by stipulating that the evidentiary preponderance of the evidence standard applies, despite previously arguing in its brief that the prima facie standard applies. (Hr'g Tr. 62, Dec. 1, 2008, Docket No. 177.) In fact, when questioned about the prima facie standard argued for by Noble in its brief, Noble explicitly stated during the April 1, 2009 telephonic hearing that it was disclaiming any reliance on the prima facie standard. (Hr'g Tr. 14, April 1, 2009, Docket No. 180.) The Court also notes that the requirement of personal jurisdiction is an individual right which may be waived. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703–705, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). In addition, the Supreme Court has previously upheld the personal jurisdiction of a district court based on a stipulation by one of the parties. *Petrowski v. Hawkeye–Security Co.*, 350 U.S. 495, 76 S.Ct. 490, 100 L.Ed. 639 (1956). Therefore, if the parties may stipulate to personal jurisdiction, they should be able to stipulate to the standard by which such jurisdiction is determined.

6. The Court received a letter from Noble's counsel on December 4, 2008 which attached additional documents for the Court's consideration, though without indicating that Third Party Defendants stipulated to admission of such documents for purposes of the jurisdiction finding. These documents were the sub-

## B. Analysis of personal jurisdiction under Virginia long-arm statute

■ "Personal jurisdiction" is the phrase used to express a court's power to bring a person into its adjudicative process. *Black's Law Dictionary* 857 (7th ed.1999). Federal district courts may exercise such personal jurisdiction "only to the degree authorized by Congress under its constitutional power to 'ordain and establish' the lower federal courts." *ESAB Group, Inc.,* 126 F.3d at 622. Furthermore, before "exercising personal jurisdiction over a defendant, a federal court must have jurisdiction over the subject matter of the suit, venue, 'a constitutionally sufficient relationship between the defendant and the forum,' and 'authorization for service of a summons on the person.'" *Id.*

Federal Rule of Civil Procedure 4(k)(1) provides that "[s]ervice of a summons or filing a waiver of service is effective to establish [a federal court's] jurisdiction over the person of a defendant" if such service is accomplished on a defendant whom the law has made amenable to the court's process. *Id.* Rule 4(k) describes several sources authorizing service to effect personal jurisdiction, including service pursuant to state law or federal statute. *Id.*

■ When service of process is authorized by Federal Rule of Civil Procedure 4(k)(1)(A), such service is sufficient to exercise jurisdiction over a defendant, "so that any challenge to the personal jurisdiction requires [this Court] to assess the jurisdiction of the court in the state where the district court is located." *Id.* "Since [personal] jurisdiction of a state court is limited by that state's laws and by the Fourteenth Amendment," *id.,* in order to determine that it has personal jurisdiction over a defendant, a district court must conduct a two-part analysis. *Peanut Corp. of Am. v. Hollywood Brands, Inc.,* 696 F.2d 311, 313 (4th Cir.1982). First, the district court must consider whether personal jurisdiction is authorized by the forum state's long-arm statute. *Mitrano v. Hawes,* 377 F.3d 402, 406 (4th Cir.2004). Second, if the exercise of such personal jurisdiction is authorized, the defendant must have sufficient minimum contacts with the forum state to meet the requirements of the Due Process Clause of the Fourteenth Amendment.[7] *Id.; see also Consulting Engineers Corp. v. Geometric Ltd.,* 561 F.3d 273, 276–77 (4th Cir.2009), *Christian Sci. Bd. of Dirs. of the First Church of Christ Scientist v. Nolan,* 259 F.3d 209, 215 (4th Cir.2001).

The Virginia long-arm statute provides multiple bases for the exercise of personal

---

ject of discussion at an on-the-record April 6, 2009 telephonic hearing. During that discussion, Noble suggested these additional documents should be considered, along with the stipulated documents, as if they had been admitted at an evidentiary hearing. The Third Party Defendants objected to such consideration and stated their reasons. The documents include a copy of the California court decision referenced above, a document that is presumably part of the public record, but which Noble disclaims reliance upon. There is also an unsigned "Interim Agreement" which is of no value in its unsigned condition. Finally, there are several emails. Having been submitted by letter rather than pleading, and having been submitted without any indi-

cation there was a stipulation permitting their consideration, these documents were not filed as a part of this case. Moreover, the Court notes that such documents were not necessary for the Court's determination of personal jurisdiction, and they do not clarify the issues presented. Therefore, the Court has not considered those documents for purposes of this motion.

7. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

jurisdiction. *See* Va.Code § 8.01–328.1. Noble asserts that a number of these bases apply in the current case, particularly Va.Code §§ 8.01–328.1(A)(1)–(3). These provisions allow the Court to "exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's transacting any business in the Commonwealth," "contracting to supply services or things in this Commonwealth," or "causing tortious injury by an act or omission in this Commonwealth." Va.Code §§ 8.01–328(A)(1)–(3).

■ Both the state and federal courts have found that "Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause." *Young v. New Haven Advocate,* 315 F.3d 256, 261 (4th Cir.2002). "Because Virginia's long-arm statute is intended to extend personal jurisdiction to the extent permissible under the due process clause, the statutory inquiry merges with the constitutional inquiry." *Consulting Engineers Corp.,* 561 F.3d at 276–77; *see Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.,* 334 F.3d 390, 396–97 (4th Cir. 2003).[8]

■ The United States Supreme Court has recognized two types of personal jurisdiction: general and specific. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 411, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Either of these will support the exercise of personal jurisdiction. General personal jurisdiction exists when a defendant has "continuous and systematic" contacts with the forum state. *Saudi v. Northrop Grumman,* 427 F.3d 271, 276 (4th Cir.2005). A defendant subject to general personal jurisdiction may

be sued in the forum state for any reason, regardless of where the relevant conduct occurred. *See Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 438, 72 S.Ct. 413, 96 L.Ed. 485 (1952). Furthermore, to support general personal jurisdiction, it is not necessary that the underlying facts of the suit arose out of or were related to the defendant's jurisdictional contacts with the forum state. *Helicopteros,* 466 U.S. at 411 n. 9, 104 S.Ct. 1868.

■ A defendant who is not subject to the general jurisdiction of a court may still be subject to specific jurisdiction if the suit is for a claim arising from or related to the defendant's activities within the state. *Id.* at 411 n. 8, 104 S.Ct. 1868. The Court must therefore determine whether general or specific personal jurisdiction may be appropriate over the Third Party Defendants.

### 1. general personal jurisdiction

■ Before analyzing general personal jurisdiction, the Court acknowledges that many of the facts relevant to the analysis of general personal jurisdiction over Ratto, Kane and JRM have already been decided by Judge Kelley in his decision regarding a case peripherally related to this matter, *Hartford Casualty Ins. Co. v. JR Marketing, LLC,* 511 F.Supp.2d 644 (E.D.Va. 2007). In his decision, Judge Kelley found that the Court could not exercise general personal jurisdiction over Ratto, Kane, and JRM because they had not maintained continuous and systematic contacts with Virginia. *Id.* at 648; *see Consulting Engineers Corp.,* 561 F.3d at 276 n. 3. Judge Kelley made the following observations: Ratto and Kane only visited Virginia once,

---

**8.** Since the constitutional due process requirements for long-arm jurisdiction have not been met with regard to the Third Party Defendants, the Court "need not reach the issue

of whether Virginia's arguably more stringent long-arm statute would have *also* denied the court personal jurisdiction." *Consulting Engineers Corp.,* 561 F.3d at 278–79.

allegedly in connection with litigation; JRM does not have an office in Virginia, and does not regularly conduct business here; and, JRM has made only three small transactions in Virginia, one of which was sending a sample computer lock to a potential customer. *Hartford Casualty Ins. Co.*, 511 F.Supp.2d at 648. Similar facts have been presented here, and this Court agrees with Judge Kelley's decision regarding general personal jurisdiction over these defendants based on those facts. Those facts are consistent with what Noble has alleged in this case, although Noble has not relied upon those facts for its argument that the Third Party Defendants are subject to general personal jurisdiction in this matter. Noble argues that the three Virginia sales by JRM (which were before Judge Kelley), when combined with the other new facts alleged in this case, are sufficient to support general jurisdiction. Those new facts consist of invoices of a separate company reflecting sales to Virginia, which argument is addressed below. Therefore, this Court will only consider the additional new facts relevant to this matter, as argued by Noble, when deciding whether they cumulatively support the exercise of general personal jurisdiction.

### a. Jane Ratto

Noble has attached numerous invoices showing sales to Virginia by a *different* counterclaim plaintiff, Noble Lock Enterprises, Inc. (NLEI).[9] Third Party Plaintiff Noble argues that, since Kane and Ratto claim to own NLEI, these NLEI invoices provide evidence that the Court has personal jurisdiction over Ratto and Kane based on NLEI's sales in Virginia. Ownership of NLEI has been bitterly disputed

by the parties, both in this matter and in litigation in California. Kane and Ratto assert that they, along with Ratto's husband, own NLEI. Noble, on the other hand, asserts that Shimon Yair, a relative of Meir Avganim, is the owner of NLEI, which the California court found to be true in its decision. *See Avganim v. Ratto*, Case No. CV054204 (Cal.App. Dep't Super. Ct.). However, as explained below, this Court finds that, for purposes of establishing personal jurisdiction in this matter, ownership of NLEI is not relevant and need not be considered by this Court for purposes of determining personal jurisdiction. Furthermore, during the April 1, 2009 telephonic hearing, Noble disclaimed any effort to argue that the California finding has preclusive effect in this case. (Hr'g Tr. 21–22, April 1, 2009, Docket No. 180.) Therefore, this Court does not rely upon the California court's decision as to ownership of NLEI.

As a general rule, each defendant's contacts with a forum state must be assessed individually. *Calder v. Jones*, 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (jurisdiction over the employer and employee is measured separately). The contacts of each officer or employee must be judged separately from those of the corporation. *Id.* ("Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction.").

Noble argues that Ratto and Kane were really employees of NLEI. Ratto and Kane argue that they were independent contractors of NLEI, in addition to being the owners. However, for purposes of de-

---

9. According to deposition testimony by Noble's corporate representative, Noble and NLEI are completely independent companies, as is discussed in greater detail below. (*See* Takata Dep. 61, Third Party Defendants' Supp. Brief Ex. 5, Docket No. 171.)

ciding personal jurisdiction, this Court need not consider Ratto and Kane's employee or independent contractor status because, in evaluating each defendant's individual contacts with the forum, the Court finds that, in either case, the NLEI sales invoices do not establish general jurisdiction over Ratto and Kane.

The NLEI invoices, submitted with Noble's supplemental brief, show a significant number of computer lock sales to Virginia for a period of time beginning in early 2004 and ending in late 2005.[10] The invoice reflecting the highest dollar amount of sales was for $171,959.93. Other invoices reflect sales as small as $23.95. The invoices include a box labeled "Rep", which is presumably to reflect the representative responsible for the sales. The invoices for NLEI indicate representatives with the initials "J", "SH," "Scott," "Richa," or no initial or name at all. Noble appears to believe that the invoices with "J" shown as the representative indicate that Ratto (whose first name is Jane) was responsible for the sales. However, nowhere in its discovery submission has Noble established that the "J" in the invoice box somehow shows that Ratto was responsible for those sales in Virginia through NLEI. Noble has attached deposition testimony and affidavits by Ratto, but this matter of the NLEI invoices has not been addressed. Instead, Ratto has submitted sworn affidavits that she has never personally transacted business in the Commonwealth of Virginia. Noble has not sustained its burden of establishing that the NLEI invoices sent to Virginia show otherwise. Ratto has never conceded that she was the sales representative responsible for the sales to Virginia where "J" is listed as the representative. In her brief, Ratto's counsel came close to making such

a concession by arguing that "[t]he attached invoices clearly show that Jane Ratto transacted business in Virginia on behalf of NLEI." (Third Party Defendants' Supp. Brief, Docket No. 171 at 13.) However, that sentence could just as easily refer to Ratto acting pursuant to her alleged ownership of NLEI, not that Ratto made the sales to Virginia as either an employee or independent contractor.

The invoices with "J" span an extensive time throughout 2004 and 2005. The sales amounts on the various invoices are most commonly $1,149.60, and the other invoices typically reflect a minimum sale of at least several hundred dollars. Given that the Virginia invoices show a significant dollar amount of sales over an extensive period of time, such invoices might have sufficiently established the "continuous and systematic" contacts necessary to establish general jurisdiction if the representative responsible for such sales had been established. However, without a showing that Ratto personally was responsible for those sales to Virginia, Noble has not sustained its burden of proof for establishing that Ratto is subject to the general personal jurisdiction of this Court.

### b. Penelope Kane

Noble's argument regarding general personal jurisdiction over Kane is similarly based on Kane's 1) asserted ownership of NLEI, 2) employee or independent contractor status, and 3) the NLEI invoices. Because the Court has addressed these same arguments above regarding Ratto, there is no need to restate the analysis here. However, the Court does observe that there is much less basis for asserting general personal jurisdiction over Kane because none of the NLEI invoices reflect anything remotely similar to Kane's name

---

**10.** There are several invoices dated in 2003 which were apparently samples sent to pro-spective customers and therefore did not result in any payment to NLEI.

or initials in the box indicating the representative responsible for the sale. Like Ratto, there is no evidence that Kane was responsible for any NLEI sales to Virginia. Instead, Kane also has submitted a sworn affidavit stating that she personally does not transact business in Virginia. Therefore, Noble has not sustained its burden of proof for establishing that Kane is subject to the general personal jurisdiction of this Court.

### c. JRM

As discussed earlier, no new facts different from those considered by Judge Kelley have come to light regarding any sales by JRM to Virginia or any other continuous and systematic contacts which might subject JRM to the general personal jurisdiction of this Court. For that reason, this Court agrees with Judge Kelley's previous ruling that JRM is not subject to the general personal jurisdiction of this Court. Therefore, since there is no general personal jurisdiction over Ratto, Kane and JRM, as they have not maintained continuous and systematic contacts with Virginia, the Court must consider whether it may exercise specific personal jurisdiction over the Third Party Defendants.

### 2. specific personal jurisdiction

When considering the Fourteenth Amendment due process required to justify the exercise of personal jurisdiction pursuant to a state long-arm statute, the Supreme Court has recognized that a district court may exercise specific personal jurisdiction over a defendant only if the defendant has sufficient "minimum contacts" with the forum state. *See Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154. One who enjoys the privilege of conducting business in the forum state should also bear the reciprocal obligation of answering to legal proceedings in that forum state. *See id.* at 319, 66 S.Ct. 154. A single act by a defendant may be sufficient to satisfy

the necessary "quality and nature" of such minimal contacts, although "casual" or "isolated" contacts are insufficient. *Id.* at 317–18, 66 S.Ct. 154; *see also McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223–24, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957) (recognizing jurisdiction on basis of defendant's single contact with the forum state). A defendant will not be subject to personal jurisdiction without " 'fair warning that a particular activity may subject [him] to the jurisdiction of a foreign sovereign.' " *Burger King Corp.,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (quoting *Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring in judgment)). In addition, "the defendant's actions must be directed at the forum state in more than a random, fortuitous, or attenuated way." *ESAB Group, Inc.,* 126 F.3d at 625. "Because a sovereign's jurisdiction remains territorial, to justify the exercise of personal jurisdiction over a non-resident defendant, the defendant's contacts with the forum state must have been so substantial that 'they amount to a surrogate for presence and thus render the exercise of sovereignty just.' " *Consulting Engineers Corp.,* 561 F.3d at 276–77.

The Fourth Circuit has expressed the due process requirements for asserting specific personal jurisdiction through a three part test in which it considers "(1) the extent to which the defendant purposefully availed himself of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Engineers Corp.,* 561 F.3d at 278. The first prong expresses the minimum contacts requirement of constitutional due process that the defendant purposefully avail himself of the privilege of

conducting business under the laws of the forum state. *Id.* If, and only if, the Court finds that a plaintiff has satisfied this first prong of the test for specific jurisdiction does the Court move on to a consideration of prongs two and three. *Id.* If a plaintiff satisfies prong two, then and only then does the Court move on to prong three. *Id.*

Noble has identified a number of "contacts" which it claims subject the Third Party Defendants to this Court's specific personal jurisdiction. It relies upon the following: 1) the license agreement signed by JRM and MIZ (a contract with Virginia choice of law provisions), 2) the fact that the Third Party Defendants allegedly forwarded Noble's confidential business information (customer contact information) to attorneys in Virginia pursuant to the express terms of the license agreement, 3) the actions taken by the Dunlap firm as the alleged agent for the Third Party Defendants, and 4) the Third Party Defendants' interaction with MIZ and its counsel in the alleged conspiracy to harm Noble by intentionally filing a meritless patent infringement lawsuit against Noble in Virginia in order to discredit Noble and steer Noble customers to JRM.

### a. licensing agreement

In arguing that this Court may properly exercise personal jurisdiction over the Third Party Defendants via the Virginia long-arm statute, Noble attempts to rely on a licensing agreement signed by JRM and MIZ with Virginia choice of law and choice of forum provisions. However, with the exception of the actual agreement that was submitted to the Court, the Court has very few facts available to determine whether the contract may serve as a basis for establishing personal jurisdiction over the Third Party Defendants.

The Fourth Circuit has found that the Virginia long arm statute "does not extend to a contract formed and performed outside Virginia." *Promotions, Ltd. v. Brooklyn Bridge Centennial Comm.,* 763 F.2d 173, 175 (4th Cir.1985). Furthermore, "[a] contract which is accepted and becomes effective in another forum generally will not satisfy minimum contacts." *Superfos Invs. Ltd. v. First-Miss Fertilizer, Inc.,* 774 F.Supp. 393, 398 (E.D.Va.1991). However, specific personal jurisdiction is appropriate for causes of action arising out of the consummation of a contract in Virginia between a nonresident and a Virginia citizen because such actions constitute "transacting business" under the long-arm statute and comport with the minimum contacts requirements of the Due Process Clause. *Viers v. Mounts,* 466 F.Supp. 187, 190–91 (W.D.Va.1979) (noting that mere contract negotiations carried out in Virginia between a state citizen and a nonresident with execution and performance of the contract in a foreign forum is not sufficient transaction of business to assert personal jurisdiction over the defendant).

When a court determines whether the consummation of a contract provides a sufficient basis for personal jurisdiction, the court must consider: "1) where the contract was negotiated and executed, 2) who initiated the contact, 3) the extent of the communications, both telephonic and written, between the parties, and 4) where the obligations of the parties under the contract were to be performed." *Decision Insights, Inc. v. Quillen,* No. 05–0335, 2005 WL 2757930, *5, 2005 U.S. Dist. LEXIS 27482, at *14 (E.D.Va. Oct. 21, 2005) (citing *Affinity Memory & Micro v. K&O Enters.,* 20 F.Supp.2d 948, 952 (E.D.Va.1998)); *see also Masselli & Lane, PC v. Miller & Schuh, PA,* No. 99–240, 215 F.3d 1320,

2000 WL 691100, *3, 2000 U.S.App. LEXIS 11932, at *7 (4th Cir. May 30, 2000). Telephone calls, letters, and faxes alone are insufficient to form a basis for personal jurisdiction. *Initiatives Inc. v. Korea Trading Corp.*, 991 F.Supp. 476, 479 (E.D.Va.1997); *Superfos*, 774 F.Supp. at 397–98; *Unidyne Corp. v. Aerolineas Argentinas*, 590 F.Supp. 391, 396 (E.D.Va. 1984).

In *Initiatives*, none of the foreign defendant's officers, directors, or employees visited Virginia in connection with the contract. *Initiatives*, 991 F.Supp. at 479. The correspondence, meeting agenda, and the contract itself did not contain any indications that the foreign defendant expected the plaintiff to conduct business on its behalf in Virginia. *Id.* The court found that the defendant had not purposefully availed itself of the benefits and protections of Virginia law, and there was no specific jurisdiction over the defendant. *Id.* at 480. Although separately addressed in the context of general jurisdiction rather than specific jurisdiction, the *Initiatives* court rejected reliance on Virginia choice of law provisions in a contract to support personal jurisdiction and cited *Burger King* for the proposition that choice of law provisions are relevant as a factor in determining whether a defendant purposely availed itself of the relevant state's laws, but that the choice of law provisions cannot alone establish jurisdiction. *Id.; see Consulting Engineers Corp.*, 2009 WL 738165, at *5 (choice of law provision standing alone would be insufficient to confer personal jurisdiction). On the other hand, the Fourth Circuit has recognized that where telephonic negotiations occurred with one of the participants located in Virginia, and numerous written communiques between the parties were sent to and received in Virginia, "[t]here was sufficient 'contracting' in Virginia to amount to the transaction of business from which the cause of action arose." *Peanut Corp. of Am. v. Hollywood Brands, Inc.*, 696 F.2d 311, 314 (4th Cir.1982).

In this case, Noble has not met its burden of proof for the exercise of specific personal jurisdiction over the Third Party Defendants based on the licensing agreement between JRM and MIZ. The Court notes at the outset that Noble is not even a party to the agreement in question, and the choice of law provisions contained in the agreement presumably apply only to disputes that may arise between the actual parties to the agreement. Second, the agreement is between a California limited liability company, JRM, and a Taiwanese corporation, MIZ. No Virginia resident was involved other than (presumably) the Dunlap law firm, which represented MIZ, but was not a party to the licensing agreement. Third, in their brief and during oral argument, Third Party Defendants asserted that the agreement was actually executed in Nevada, not Virginia, which assertion Noble did not dispute during oral argument. (Third Party Defendants' Supp. Brief, Docket No. 171 at 14; Hr'g Tr. 18, Dec. 1, 2008, Docket No. 177.) Fourth, the extent of the communications to and/or from Virginia is unclear. Ratto and Kane visited Virginia once, which was allegedly partially in connection with the licensing agreement, and such negotiations allegedly took several months to complete. However, there is no evidence regarding where and how the rest of the communication and negotiation regarding the licensing agreement took place and between what entities or persons it was negotiated. In addition, the obligations of the parties under the agreement do not provide sufficient ties with Virginia so as to establish personal jurisdiction over the Third Party Defendants. Finally, as discussed in detail below, the licensing agreement did not even necessarily affect Noble (as opposed to

some other Noble entity), so it is difficult to see how Noble's claims could arise from the licensing agreement and make specific personal jurisdiction appropriate. In short, the Court cannot exercise specific personal jurisdiction over the Third Party Defendants based upon the agreement between JRM and MIZ when the facts regarding such agreement lack sufficient clarity to allow the Court to make a determination as to whether the Third Party Defendants have availed themselves of the benefits and protections of Virginia law. *Consulting Engineers Corp.*, 561 F.3d at 278 (no need to consider second and third prongs of specific personal jurisdiction test if first prong—availing itself of privilege of conducting activities in state—is not satisfied).[11]

### b. customer information allegedly forwarded to attorneys

 Noble alleges that the Third Party Defendants forwarded Noble's confidential business information (customer contact information) to attorneys in Virginia pursuant to the express terms of the contract between JRM and MIZ. However, the Court finds this factor insufficient—even as alleged—to support the exercise of specific personal jurisdiction over the Third Party Defendants. First, the express terms of the "Lock Supply, Distribution & Licensing Agreement" between MIZ and JRM require JRM to provide information to MIZ, not MIZ's Virginia counsel, regarding the businesses, activities or operations of some of the Noble entities. Most importantly, Noble, the third party plaintiff in this matter, *is not listed* as one of the entities about whom JRM was to provide information to MIZ. The agreement provides as follows:

> Within five (5) business days after execution of this Agreement, [JRM] shall use its reasonable commercial efforts to provide to [MIZ] any and all available information, tangible or otherwise, known to [JRM], in [JRM's] possession, or otherwise capable of being obtained by [JRM], relating to the import/export businesses, activities or operations of the following named parties, unless such information is privileged or [JRM's] legal counsel otherwise advises [JRM] that it should not disclose such information: (A) Noble Enterprises, LTS., an Israeli limited company, ("Noble") [sic], (B) Meir Avganim, an individual and the person responsible for overseeing Noble, (c) [sic] Office Security, Inc. ("Office Security"), (D) Shimon Yair, and [sic] individual, who claims to be the sole owner of Noble Locks Enterprises, Inc. ("NLEI"). [JRM] shall continue to supplement any information provided to Seller pursuant to this subsection on an on-going basis.

(Agreement § 5(b)(ii), Oct. 31, 2005, Noble Supp. Brief Ex. 9 at 4, Docket No. 166.)

In a deposition excerpt provided to the Court, Ratto admitted that, at some point, she shared customer contact information. However, the deposition testimony provided is not clear as to whether Ratto provided the customer information to MIZ directly or whether she provided it to MIZ's counsel. Furthermore, the deposition testimony adds further confusion regarding whether Noble's customer information was shared or whether it was customer information for some other Noble entity. The

---

11. Even if Noble had shown that the Third Party Defendants specifically availed themselves of the privilege of conducting activities in Virginia, it cannot satisfy the second part of the due process test because the lack of clarity as to which entity was affected by the licensing agreement prevents Noble from showing that its claims arise out of the licensing agreement's formation.

Court notes that the reference to "Noble" contained in the deposition testimony below likely refers to Noble Enterprises, LTS, rather than Noble Security, Inc., the third party plaintiff in this case that is simply referred to as "Noble" throughout this Opinion and Order, because the language in the deposition question seems to indicate that the questioner was reading from the licensing agreement, which references "Noble" as Noble Enterprises, LTS, rather than Noble Security, Inc.

Q. Ms. Ratto, when did you agree with MIZ Engineering to provide them with all of the information that you had about Noble, Noble Locks Enterprises, Office Security, Shimon Yair, Meir Avganim, including any claims for patent infringement, false advertising, false marketing, disgorgement of profits and any other information that you had about the Avganims or their businesses? [ . . . ]

A. Well, MIZ came—we had a lawsuit because every lock I ever sold infringed and so therefore MIZ tried to sue us and in turn for not suing us, we had to give information to them. And I believe it's in the contract.

Q. Did you provide MIZ Engineering with all of your customer contact information so that their attorney, Thomas Dunlap, could contact those customers?

A. I provided them with a lot of customer contacts because they wanted to send a letter out, telling those customers not to infringe. [ . . . ] They [MIZ] were a supplier and we had an agreement with them. [ . . . ]

Q. None of MIZ's—

A. A 30–page agreement that took about two months to do.

Q. I thought your customer list was private and proprietary, Ms. Ratto, and you didn't intend to share it with anyone? [ . . . ]

A. I didn't give them my customer list, I gave them certain customers, primary customers.

Q. The customers who were buying Noble Locks?

A. So they could send a stop-and-cease letter out to them.

Q. Even though you told the court that your information was private and proprietary, you kept it to yourself within your company and within your own employees; isn't that right?

A. Correct. You know, it shouldn't have been given to them, but it was.

Q. Who gave it to them?

A. I did on the request of the attorney or—counsel, I mean.

(Ratto Dep. 1190:22–1191:18 and 1193:23–1194:25, Noble Supp. Brief Ex. 5, Docket No. 166.) It is clear from Ratto's deposition testimony that customer contact information was provided to either MIZ or to MIZ's attorney. However, the record is unclear as to who received the customer information provided by Ratto and is further unclear as to whether third party plaintiff Noble Security, Inc.'s customer information was even part of that disclosure. Noble has not even attempted to provide a list of its customers whom it alleges may have been contacted by the Dunlap law firm or the Third Party Defendants. Given the complete lack of clarity in the evidence submitted by Noble, and the total lack of evidence as to whether any *Noble* customer information was even disclosed, Noble has not established that the Third Party Defendants forwarded Noble's confidential business information to attorneys in Virginia pursuant to the

express terms of the licensing agreement. Therefore, the Court cannot exercise specific personal jurisdiction on this basis because it cannot be said that Third Party Defendants availed themselves of the privilege of conducting activities in the state, or that Noble's claims arise out of the activities allegedly directed at Virginia by the Third Party Defendants. *Consulting Engineers Corp.*, 561 F.3d at 278.

### c. MIZ's counsel as agent for Third Party Defendants

During oral argument, Noble suggested that the Third Party Defendants are subject to the personal jurisdiction of this Court because the Dunlap law firm, which had offices in Virginia and Washington D.C., acted as an agent for the Third Party Defendants and solicited customers for a joint venture with MIZ, in violation of the Lanham Act. The Fourth Circuit and other courts have found that personal jurisdiction may be based on contacts made by authorized agents. *Consulting Engineers Corp.*, 561 F.3d at 278 (purposeful availment may be found based in part on whether defendant maintains agent in forum state); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 55–60 (1st Cir.2002) (agent's acts may be attributed to principal for jurisdictional purposes when, under standard agency principles, agent is authorized to act on behalf of principal or principal ratifies agent's conduct); *see also Williamson v. Petrosakh Joint Stock Co.*, 952 F.Supp. 495, 498 (S.D.Tex.1997) (actions by agents may be used to assert jurisdiction over principal if agency relationship is established). The Court must therefore determine whether Dunlap was acting as an agent for the Third Party Defendants.

"In determining whether an agency relationship exists, the critical test is the nature and extent of control exercised by the purported principal over the agent." *Butterworth v. Integrated Resources Equity Corp.*, 680 F.Supp. 784, 789 (E.D.Va.1988). Even if no actual agency exists, one party may be held to be an agent of a second party on the basis that the first party has been held out by the second party in such a way that reasonably induces reliance on the appearance. *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 166 (4th Cir.1988). Generally, apparent agency occurs when it is the principal, rather than the agent, who represents or holds out to others that agency exists. *In re MBA, Inc.*, 51 B.R. 966, 973 (Bankr. E.D.Va.1985). Therefore, "[a]n apparent agent is one who reasonably appears to third persons, because of manifestations of another, to be authorized to act as agent for such other." *Lynn v. Farm Bureau Mut. Auto. Ins. Co.*, 264 F.2d 921, 924 (4th Cir.1959).

In this case, Noble has not sustained its burden of showing that Dunlap acted as an agent for the Third Party Defendants. Dunlap acted as the attorney for MIZ, and it is clear that Dunlap acted as an agent for MIZ. However, the record before the Court does not establish that the Third Party Defendants exercised the requisite control over Dunlap such that he was their agent, nor does such discovery reflect that the Third Party Defendants ever represented to third parties that such an agency relationship existed so as to create an apparent agency. Dunlap's email of January 13, 2006 reflects business representation and proposed sales to a potential customer. (*See* Jan. 13, 2006 email from Dunlap to Michalski, Lu, and "Benson–MIZ", Noble Supp. Brief Ex. 11, Docket No. 166.) Dunlap was acting as a liaison with a potential customer who wanted " 'timeframes, financial terms, pricing, assurances against supply interruption etc' [sic] for our proposal that [the customer] discontinue all sales of the Noble Lock." (*Id.*) That email was

subsequently forwarded by Marc Michalski ("Michalski"), the MIZ United States Sales Director, to Ratto, and to Kane, with the statement "please provide Tom the info below so we can get this rolling[.]" (Jan. 13, 2006 email from Michalski to Ratto and Kane, Noble Supp. Brief Ex. 11, Docket No. 166.) However, what is missing from the record is what the Third Party Defendants did in response to Dunlap's request for information to forward to the potential customer. Such a response might possibly have shown that the Third Party Defendants were holding out the Dunlap law firm as their agent so as to create an apparent agency—but no such information appears in the record before the Court.

The Court sees no evidence that the Third Party Defendants exercised the necessary control over Dunlap to create an agency relationship or that the Third Party Defendants held out Dunlap as their agent. However, Dunlap was clearly an agent for MIZ. The letter that Dunlap sent regarding the alleged infringement and lawsuit states that Dunlap represents MIZ. There does not appear to have been much, if any, direct interaction between the Dunlap law firm and the Third Party Defendants. MIZ's United States Sales Director, Michalski, coordinated the Dunlap law firm's actions where they relate to the dealings with the Third Party Defendants. Michalski requested information from the Third Party Defendants for use by Dunlap (including potential pricing information, as well as approval of a draft letter to be sent to customers regarding the infringement), forwarded an email from Dunlap to Ratto and Kane so that they could work together in obtaining interpled funds, and sent a copy of the drafted complaint to the Third Party Defendants, among other things. (See Noble Supp. Brief Exs. 11, 12, and 21, Docket No. 166.) These emails show that the interaction between the Dunlap law firm and the Third Party Defendants generally occurred through MIZ, rather than directly. Noble has not met its burden of showing that the Third Party Defendants are subject to the specific personal jurisdiction of this Court based on the Dunlap law firm's actions, as alleged agent for the Third Party Defendants, because Noble has not established that such an agency relationship, either actual or apparent, existed. Therefore, on this record, it cannot be said that the Third Party Defendants engaged in purposeful availment, under the first part of the due process test, nor that Noble's claims arise out of activities directed at Virginia by the Third Party Defendants, under the second part of the due process test. *Consulting Engineers Corp.*, 561 F.3d at 278.

### d. conspiracy between MIZ and Third Party Defendants[12]

Noble alleges that the Third Party Defendants should be subject to the specific personal jurisdiction of this Court because they were part of a conspiracy to harm Noble, and assisted MIZ's attorneys in Virginia in filing a meritless patent infringement lawsuit against Noble in this Court to discredit Noble and to steer Noble customers to JRM. In support of these allegations, Noble points to Ratto's deposition testimony, as discussed above, where she admitted to giving either MIZ or

12. During oral argument and in its brief, Noble referenced an alleged conspiracy between MIZ and the Third Party Defendants to harm Noble, and asserts that personal jurisdiction over the Third Party Defendants is appropriate based on the actions of MIZ's counsel, the Dunlap law firm, which has an office in Virginia. Implicit in that argument is the assertion that the Third Party Defendants may be subject to personal jurisdiction based on the actions of MIZ as a co-conspirator. The Court therefore addresses that argument.

MIZ's counsel customer information. However, as previously noted, it was not established whether *Noble*'s customer information was given versus information belonging to some other entity. Noble has provided other evidence to support its theory that MIZ, Ratto, Kane, and JRM were all part of a conspiracy, although the evidence does not necessarily show a conspiracy to harm *Noble*. The evidence provided by Noble includes the following:

- Michalski, MIZ's United States Sales Director located in Florida, drafted a letter to be sent to "Customers" stating that MIZ and Royal Locks (otherwise known as JRM) are now partners, that only Royal Locks is authorized to distribute the locks, and that any other supplier offering the locks is infringing on the MIZ patent. Michalski forwarded the draft of the letter to Ratto via email dated October 10, 2005, although there is no evidence that such a letter was ever sent to any customers. (Noble Supp. Brief Ex. 13, Docket No. 166.)

- Michalski sent an email to Dunlap, Francisco Lu, Ratto, Kane, "Benson Lu" and DeMartinis on December 6, 2005 regarding the letters to customers saying that "[a]s requested Tom [Dunlap] will draft a letter to customers today to announce the noble [sic] infringement of our patent.[13] And he will tell them of the action were [sic] taking. He will even include a copy of the lawsuit so if we deem it appropriate we can show the customer that as well [sic]." (Noble Supp. Brief Ex. 14, Docket No. 166.)

- Dunlap sent an email to Ratto and Kane on January 9, 2006 with the subject line "letter to hp [sic]" stating in the body of the email "here is what ed has been sent [sic]." The email attached a document titled "Notice of claim letter to HP.pdf" which is the letter apparently sent by Dunlap to Mr. Ed Hardin at HP via fax and email on December 7, 2005. In his letter, Dunlap states that he represents MIZ and that a complaint was filed against "Noble Enterprises Ltd., a number of affiliated companies and the principals of Noble (the 'Noble Parties')." Among other statements, Dunlap's letter states that Royal Locks is MIZ's authorized distributor. The letter goes on to say that "MIZ requests that you immediately discontinue all sales of locks manufactured or sold to HP by Noble and purchase all lock requirements from Royal Locks as an authorized distributor." The letter further requests that all references to the allegedly infringing product be removed from HP's website and replaced with the MIZ product information. In return, the letter offers that "MIZ will release all claims against HP for past infringing sales" and "indemnify and hold harmless HP of any claim by Noble Lock [sic]." The letter also provided Dunlap's contact information. (Noble Supp. Brief Ex. 15 at 1–2, Docket No. 166.)

- A similar letter, which may be a draft, dated December 7, 2005 was provided by Noble as evidence; however, this letter is addressed to "Dear Sir or Ma'am" and shows no address line. This letter similarly states that a lawsuit was filed against "Noble Enterprises Ltd., a number of affiliated companies and the principals of Noble (the

---

**13.** This is not necessarily a reference to Noble, since several different entities with the word "Noble" in their name were named as defendants in the MIZ Complaint that started this litigation.

'Noble Parties')." The letter also states that "purchasing a lock utilizing the '203 patent from any Defendant named in the aforesaid Complaint may subject the purchase to liability for sales to end users of the lock product." Another draft of a letter is dated February 14, 2006 and begins "Dear _____," This draft provides an update regarding the status of the litigation as it pertains to some of the specific parties. The letter also states "[MIZ] is very interested in selling you the above push button locking mechanism and any housing components fully assembled. This would be a direct from the manufacturer sale (direct from MIZ)." Royal Locks is not mentioned in this letter, which does not appear to have been sent to anyone specifically. (Noble Supp. Brief Ex. 17 at 1–2, Docket No. 166.)

- As discussed above, Dunlap may have been involved in sales for a potential customer, HP, who received the above referenced letter from Dunlap. In a January 13, 2006 email to Michalski, Francisco Lu and "Benson–MIZ", Dunlap says "[p]er the e-mail just sent to HP's counsel, things are progressing well. I have received an original letter via overnight courier from HP requesting 'timeframes, financial terms, pricing, assurances against supply interruption etc' for our proposal that HP discontinue all sales of the Noble Lock. Please contact me, or have Penelope and Jane forward the information to me so that I may send it to HPs counsel in order to evaluate our claim and proposal to sell locks from MIZ." Michalski then forwarded that email to Ratto and Kane and stated "please provide Tom the info below so we can get this rolling." (Noble Supp. Brief Ex. 11 at 1, Docket No. 166.)

- In a January 9, 2006 email to Ratto, Kane, and Michalski, Francisco Lu stated that he "heard today that Polox had placed a new order of toolings on new locks" and requested "[p]lease continue finding Meir's websites and sales points so we can nail him." Kane responded "We need to know which lock this is? ? ? Mr. Yang needs to give us a copy of the PO? ?" After Francisco Lu responded that Mr. Yang would not give them information, Ratto responded "Maybe you can talk to him and tell him that we are just getting out supply and NOW ALL CUSTOMERS WILL BE COMING OUR WAY SO HE IS SHOULD [sic] BE WISE AND THINK ABOUT WHAT HE IS DOING!!! IT WILL NOT HAPPEN OVERNIGHT BUT I WILL GUARANTEE THAT IT WILL HAPPEN." (Noble Supp. Brief Ex. 18 at 1–2, Docket No. 166.)

- Kane provided various pieces of biographical information to the Dunlap law firm about the various Noble entities in order to assist with preparing the original complaint in this action. Ratto and Kane were also requested to let Michalski know "[a]s soon as you have confirmation as to where Meir is" so that he·could be served. Michalski requested the address of the "Noble warehouse" in Texas from Kane because "were [sic] chasing Meir around Texas now." (Noble Supp. Brief. Ex. 19 at 1–4, Docket No. 166.)

- On November 14, 2005, Kane requested "research re: Avganim research on Innovative" adding that "[o]ur MIZ attorneys need it." She also shared that "Jane and I flew to Washington to meet with attorneys and we are really tired." (Noble Supp. Brief Ex. 20 at 1, Docket No. 166.)

- On November 29, 2005, MIZ sent Ratto and Kane a first draft of the complaint in this matter that was being prepared by the Dunlap law firm. Michalski's email said "I didn't send this to you wink wink [sic]."[14] (Noble Supp. Brief Ex. 21, Docket No. 166.)

- In a December 1, 2005 email to Ratto and Kane regarding declarations for them to sign, Michalski said "Francisco is saying who is going to know your [sic] not telling the complete truth so if the statements are close to true please leave them be. It is your word against Sloan and Meir's. The closer we can stick to these statements, the more we can hurt Meir and Sloan back. He said wouldn't they do it to us? So please try to call me right away so we can all discuss this." (Noble Supp. Brief Ex. 22 at 1, Docket No. 166.)

- In a February 23, 2006 email sent to Ratto and her husband at their "mizlocks.com" email addresses, Michalski identifies what "Jane and Bob Want" beginning with "1) after Meir is chased off you want a us company maybe JEA Sales to be owned by both of you. This company will then act as MIZ Engineering direct sales representative and master distributor for all the oem business we have reclaimed." Under what "Francisco wants," Michalski noted "5) to protect against Meir conspiracy claim JEA Sales will be formed. All of Jane's employees will work under this company as MIZ direct Sales REPRESENTATIVES!!!!!!" (Noble Supp. Brief Ex. 23 at 1, Docket No. 166.)

- Although Ratto testified during a deposition that no one at MIZ Engineering was an employee of hers, she stated "[w]e paid health insurance for [Michalski]." (Ratto Dep. 1191:19–24, Noble Supp. Brief Ex. 5, Docket No. 166.)

- On December 10, 2005, Ratto sent an email to Michalski, Francisco Lu, and Kane wherein she stated "[o]ur customer (Michael) wants to bring Meir and Alex down. HOW CAN WE SET THEM UP. Marc, please work with Scott to get whatever evidence you need next week." Michalski then forwarded that email to Dunlap, MIZ's attorney, saying "here is more fuel for the fire advise if anything that needs to be done to help us." The emails were in reference to an attached email from "alex@noblelocks.com" who claims to be an "executive at Noble," and signs his email as "Alexander Avganim" for "Noble Group." In his email, "Alex" claims that Scott Harrington and his sister Jane (presumably Jane Ratto) used to work for him until they decided to open Royal Locks and import locks from China. Alex states that it took a long time to get the domain name and email address because it "was manipulated by them." He goes on to say that "Scott and Jane have been telling all Noble customers that we are no longer around, or no longer in business," and requests help in gaining back the business. (Noble Supp. Brief Ex. 16 at 1–4, Docket No. 166.)

i. personal jurisdiction based on acts of co-conspirator

 Specific personal jurisdiction in the conspiracy context need not be based

---

14. The email provided to the Court by Noble did not include a copy of the draft complaint that was attached to the email. Such email never indicated where the complaint would be filed, or who the defendants would be.

exclusively on actions of the named defendant(s). However, according to the Supreme Court, "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum state." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). "The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (citing *Int'l Shoe Co.,* 326 U.S. at 319, 66 S.Ct. 154). The defendant must be able to "reasonably anticipate being haled into court [in the forum state]" based on the defendant's contacts with that state. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 287, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

■ While it is true that a defendant will not be subject to personal jurisdiction based on the unilateral activity of one who claims a relationship with that defendant, courts also recognize that personal jurisdiction may, in some circumstances, be based upon acts by a co-conspirator. 16 James Wm. Moore et al., *Moore's Federal Practice* § 108.42[3][b], at 108–67 (3d ed.1997) (collecting cases). The courts acknowledging the conspiracy theory of jurisdiction seem to recognize that a defendant who joins a conspiracy knowing that acts in furtherance of the conspiracy have taken or will take place in the forum state is subject to personal jurisdiction in that forum state because the defendant has purposefully availed himself of the privileges of that state and should reasonably expect to be haled into court there. *See id.* at n. 24.2 (citing cases by circuit). For example, in *Dodson Int'l Parts, Inc. v.*

*Altendorf,* 181 F.Supp.2d 1248 (D.Kan. 2001), the court found that personal jurisdiction may be based on contacts of a co-conspirator who performed substantial acts in the forum state in furtherance of the conspiracy when the out-of-state co-conspirator was or should have been aware of those acts. *Id.* at 1254.

■ The Fourth Circuit recently reiterated the existence of such personal jurisdiction flowing from a conspiracy. *Consulting Engineers Corp.,* 561 F.3d at 275–80. Furthermore, several district courts in Virginia and elsewhere in the Fourth Circuit have found personal jurisdiction to exist based upon conspiratorial activity. A court in the Eastern District of Virginia has found that exercising personal jurisdiction over alleged co-conspirators does not offend traditional notions of justice and fair play. *Verizon Online Servs., Inc. v. Ralsky,* 203 F.Supp.2d 601, 622 (E.D.Va. 2002) (explaining that a co-conspirator is subject to jurisdiction in a forum where substantial acts in furtherance of the conspiracy were performed by any member of the conspiracy if the co-conspirator knew or should have known that the acts would be performed). Moreover, participation in an alleged conspiracy is sufficient to subject a defendant to personal jurisdiction in a forum even though the defendant's only contact with that forum was through the actions of a co-conspirator. *See Gemini Enters., Inc. v. WFMY Television Corp.,* 470 F.Supp. 559, 564 (M.D.N.C.1979) (explaining that connections between the conspiracy and the forum state can provide a sufficient basis for a court to assert personal jurisdiction over a nonresident co-conspirator). The *Gemini* court adopted the rationale that the necessary connections exist where "substantial acts in furtherance of the conspiracy were performed in the forum state and the co-conspirator knew or should have known that acts

would be performed in the forum state." *Id.* Another court in this district has also noted that a defendant's participation in an alleged conspiracy provided a basis for that court to assert personal jurisdiction over a defendant. *See America Online, Inc. v. Ambro Enters.,* No. 04–1498, 2005 WL 2218433, at *3 n. 1 (E.D.Va. Sept. 8, 2005). The *America Online, Inc.* court cited to *Gemini* and noted that it was sufficient to allege that the defendants in question participated in the conspiracy, and that since they knew, or should have known, that contact with Virginia would result, their participation in the conspiracy was a sufficient basis for the court to assert personal jurisdiction under the Virginia long-arm statute. *Id.*

In this case, the contacts with Virginia were mainly through Dunlap, who—as previously discussed—is clearly the agent of MIZ, although not shown to be an agent of the Third Party Defendants. Under the conspiracy theory of jurisdiction, the Third Party Defendants may be subject to personal jurisdiction based on the actions of alleged co-conspirators (in this case, MIZ) in the forum state. The question then becomes whether Dunlap's actions, as agent for MIZ, may be attributed to MIZ for personal jurisdiction purposes, and then subject the Third Party Defendants to personal jurisdiction here for the conspiracy based on MIZ's actions through the Dunlap law firm.

As discussed above, the Dunlap law firm was clearly an agent for MIZ, so the firm's actions in Virginia are attributed to MIZ as the principal. In turn, MIZ's actions (through the Dunlap law firm's Virginia actions) may also be attributed to Third Party Defendants because they are alleged co-conspirators. *See Ethanol Partners Accredited v. Wiener Zuckerbrot, Weiss & Brecher,* 635 F.Supp. 15, 18 (E.D.Pa.1985) ("When co-conspirators have sufficient contacts with the forum, so that due process would not be violated, it is imputed against the 'foreign' co-conspirators who allege there is [sic] not sufficient contacts; co-conspirators are agents for each other."). Noble has alleged a conspiracy between MIZ and the Third Party Defendants. Judge Kelley previously found that Noble's allegations regarding the Lanham Act, Virginia business conspiracy, and RICO claims were sufficient to withstand motions to dismiss such claims (although it is important to note that Judge Kelley did not have the benefit of the evidence currently before the Court). (Opinion, Sept. 28, 2007, Docket No. 146 at 11, 12, 17.) Those allegations were based in part on the alleged actions of MIZ and the Third Party Defendants, through Dunlap, serving as MIZ's counsel.

It is immaterial under this conspiracy theory whether the Third Party Defendants actually had connections with the forum themselves. It would be enough that substantial acts in furtherance of the conspiracy were allegedly committed in Virginia by Dunlap, acting as MIZ's agent, and that the Third Party Defendants knew or should have known that those acts would be committed in Virginia. Through the email communications, Ratto and Kane, and therefore JRM, were clearly aware of the actions MIZ was taking in filing a lawsuit and that Dunlap, who had a Virginia office and a Washington, D.C. office, was sending letters to potential customers who were allegedly infringing on the MIZ patent. MIZ emailed draft language of the letter to Ratto and asked "will this work?" (Oct. 10, 2005 email from Marc Michalski to Ratto, Noble Supp. Brief Ex. 13 at 1, Docket No. 166.) In another email, Michalski notified Ratto and Kane, among others, that Dunlap would "draft a letter to customers today to announce the [N]oble infringement of our patent. And he will tell them of the action

were [sic] taking." (Dec. 6, 2005 email from Marc Michalski to Thomas Dunlap, Francisco Lu, Ratto, Kane, Benson Lu, and De Martinis, Noble Supp. Brief Ex. 14 at 1, Docket No. 166.)

Noble has shown that the Third Party Defendants knew, or should have known, about some of the alleged conspiratorial actions taken by MIZ's counsel. This record reflects that Ratto and Kane came to Dunlap's Virginia office one time but does not reflect whether Dunlap's additional interactions (with and known to Ratto and Kane) took place from their Virginia or Washington, D.C. office. If more than the one Virginia meeting had been shown, the Third Party Defendants' participation in the alleged conspiracy could have theoretically provided a sufficient basis for this Court to exercise long-arm statute personal jurisdiction over the Third Party Defendants. However, a more basic problem exists—namely that Noble has failed to show that Noble was the target of the alleged conspiracy.

### ii. confusion regarding conspiracy against Noble

As repeatedly noted, a major problem with this case is the confusion caused by the number of parties and, in particular, the similarities in names regarding the entities bearing the word "Noble" as part of the name. The majority, if not all, of the evidence provided by Noble to support its claims of long-arm statute personal jurisdiction over the Third Party Defendants appears to have been obtained from the California litigation, which apparently involved some similar parties. Unfortunately, this makes it even harder to determine the facts of this case and whether personal jurisdiction is appropriate here because so much of the evidence does not appear to be directly on point. Instead, the Court is stuck "comparing apples and oranges," to use the old adage.

In a hearing on discovery motions before United States Magistrate Judge F. Bradford Stillman, counsel for Noble repeatedly assured the Court that 42 pages of documents, in addition to excerpts from several depositions, were all that Noble needed to show personal jurisdiction. (Discovery Hr'g Tr. 15–17, 31, Aug. 30, 2007, Docket No. 143.) On that basis, Judge Stillman ruled that all of that material could be presented to this Court to determine personal jurisdiction. Noble has presumably presented to the Court all of the evidence it claimed was necessary to show personal jurisdiction. And, as previously discussed, Noble agreed that the Court is to consider this evidence under the preponderance of the evidence standard as if an evidentiary hearing had been held. However, after discovery and an extended delay in the litigation, the evidence produced by Noble falls short of establishing by a preponderance of the evidence that the Third Party Defendants should be subject to the specific personal jurisdiction of this Court.

At the very least, Noble appears to be confusing the line between Noble and NLEI, which are two separate entities. There is no evidence before the Court to show that any of Noble's customers were contacted by Dunlap (or anyone else), or even that any of *Noble*'s customer information was shared with MIZ or the Dunlap law firm. After being questioned in a deposition about giving "Noble" customer information, Ratto discussed her actions in apparently sharing some customer information. However, as explained above, the reference to "Noble" appears to be a reference to Noble Enterprises, LTS, an Israeli company, not Noble Security, Inc., the only third party plaintiff in this action.

In addition, there is only *one* letter before the Court that was sent from Dunlap to any customer, and that was the letter to

Ed Hardin at HP. However, Noble has provided no evidence that HP was even a Noble customer. The letter from Dunlap to Ed Hardin at HP offers to "indemnify and hold harmless HP of any claim by Noble Lock." (Noble Supp. Brief Ex. 15 at 2, Docket No. 166). Such a reference seems to indicate that HP was a NLEI customer, since the words "Noble Lock" are part of the NLEI name. In addition, Noble has provided an excerpt of deposition testimony from Edmund Joseph Hardin in the California litigation. Mr. Hardin is presumably the same person who received the email from Dunlap to Ed Hardin at HP. In his deposition excerpt, Mr. Hardin never says that HP was a Noble customer. He does say that HP is not purchasing locks from Meir Avganim in North America due to the "litigation involving Meir and Noble Lock and MIZ." (Hardin Dep. 27:23–28:5, Noble Supp. Brief Ex. 25, Docket No. 166.) Such a reference is far from clear that HP was even a Noble customer, as opposed to an NLEI customer, which again could explain the reference to "Noble Lock" in the letter from Dunlap to Ed Hardin referenced above.

Other evidence also seems to indicate that HP was not necessarily a customer of Noble. Noble provided the declaration of Tony Wehbe, a supply base manager for a company "supporting the computer company Hewlett–Packard ('HP')" that apparently "conducted several business dealings with Noble Security Systems ('Noble') and provided to HP computer locks made by Noble." (Wehbe Decl., Noble Supp. Brief Ex. 24 at 1, Docket No. 166.) That declaration seems to indicate that HP was supplied with its computer locks by a separate Noble entity (Noble Security Systems), not Noble Security, Inc., the third party plaintiff here. Furthermore, although voluminous invoices were provided by Noble as part of this case, no invoice (identified by Noble or otherwise) shows a sale by Noble to HP. Such an invoice would have shown that HP was—at least at one time—a customer of Noble. However, no such evidence was submitted.

The Court must observe that it appears, based on Noble's own representations, that NLEI, not Noble, was in fact the entity that sold the majority of the locks to customers—probably including HP. The majority of the invoices provided by Noble to show computer lock sales are invoices from NLEI. In fact, there are only two invoices provided by Noble that were actually issued by Noble; one is dated December 29, 2004 and the other is dated March 24, 2005. Of the stack of invoices provided by Noble, the most recent invoices were issued by NLEI in August of 2005. During oral argument, counsel for Noble indicated that Noble (referred to in oral argument as "NSI") is essentially a successor of the NLEI business because the "Noble/Avganim family" started moving the lock business to Noble after the fallout with Ratto and Kane, presumably sometime in late 2005, though that is even unclear from the argument and evidence. (Hr'g Tr. 51–53, Dec 1, 2008, Docket No. 177.) Before that time, Noble apparently sold other products, but not the computer lock based on the '203 patent. In fact, Noble was not even formed until 2003, according to Noble's counsel. (*Id.* at 52.) The bulk of the evidence indicates that NLEI primarily sold the locks in question. Based on the record placed before this Court, it appears that any conspiracy to take away lock sales would have likely harmed NLEI, not Noble. No evidence was submitted by Noble regarding whether or when Noble took over NLEI's lock sale business, or even when Noble was formed. Similarly, no evidence was submitted by Noble regarding the relationship, if any, between NLEI and Noble, or whether Noble has any right

to assert a claim on NLEI's behalf. In fact, the Court notes that Third Party Defendants submitted deposition testimony from Teena A. Takata, who was provided by Noble as a corporate representative, wherein she stated that "NLEI was an independent company operating on its own with no direct relationship to [Noble]." (Takata Dep. 61, Third Party Defendants' Supp. Brief Ex. 5, Docket No. 171.)

In light of the evidence indicating that Noble and NLEI were independent companies, and because there is no evidence regarding the relationship between Noble and the other entities, the Court cannot consider anything other than the actions relevant to Noble itself when determining whether the Third Party Defendants availed themselves of the privilege of conducting business in Virginia by participating in a conspiracy with sufficient ties to Virginia. Furthermore, only such actions relevant to Noble would be considered in determining whether Noble's claims arise out of activities directed at Virginia. *Consulting Engineers Corp.*, 561 F.3d at 278.

### iii. no evidence of injury to Noble

The Court also notes that there are no affidavits provided by anyone at Noble regarding any of the issues in this case, including whether Noble even lost customers or had customers contacted by the Dunlap law firm or anyone else. The email from Alexander Avganim to a former or potential customer, where he makes representations regarding the harm caused by Ratto and Royal Locks and discusses "Noble customers," is signed by him for "Noble Group." (*See* Dec. 9, 2005 email from "ALEX" to "Jet Li," Noble Supp. Brief Ex. 16 at 2–4, Docket No. 166.) Furthermore, it came from the email address "alex@noblelocks.com," does not mention Noble Security, Inc., and Noble Group is never defined. (*Id.*) The Court has no evidence or even indication as to whether "Noble Group" is a separate Noble entity or perhaps a casual reference to a number of Noble entities as a whole. In addition, the Court notes that Ratto's email forwarding the email from "Alex" to Michalski, Francisco Lu, and Kane states that "[o]ur customer (Michael) wants to bring Meir and Alex down. HOW CAN WE SET THEM UP." (Noble Supp. Brief Ex. 16 at 1, Docket No. 166.) Ratto's email does not mention Noble. Therefore, for all of the above reasons, Noble cannot use the email from Alexander Avganim to show that any of its customers were contacted or that Noble was harmed.

Furthermore, during a discovery hearing before Judge Stillman, Noble previously stipulated that it would not allege any injury to Noble in Virginia as the basis for personal jurisdiction, which presumably indicates that Noble did not lose any of its Virginia-based sales—if there were any. (Discovery Hr'g Tr. 41–45, Aug. 30, 2007, Docket No. 143.) Instead, the parties had the opportunity to conduct discovery on the issue of personal jurisdiction. Noble's counsel assured the Court that the only evidence it needed to show personal jurisdiction is the evidence that is before the Court now. However, the evidence before the Court now does not show that specific personal jurisdiction over the Third Party Defendants via the Virginia long-arm statute is appropriate because there is no evidence that *Noble* was even linked to the alleged actions taken by the Third Party Defendants themselves or their alleged co-conspirators.[15] *Consulting Engineers Corp.*, 561 F.3d at 278.

---

**15.** While Noble's failure to clarify the entities against which the conspiracy was aimed is enough to undercut its assertion of jurisdiction, the Court also notes that Ratto has denied that a conspiracy even existed. Though referring to "Noble Locks" rather than Noble,

#### iv. due process test

As outlined above, in deciding whether a defendant's contacts satisfy constitutional due process requirements for asserting specific personal jurisdiction, a district court must apply a three-prong test. In determining whether Noble has satisfied the due process requirement for asserting personal jurisdiction, the Court is required to consider the following: (1) the extent to which the Third Party Defendants have purposefully availed themselves of the privilege of conducting activity in Virginia, or otherwise invoked the benefits and protections of the laws of the Commonwealth; (2) whether Noble's claims arise out of the Third Party Defendants' Virginia-related activity; and (3) whether exercising personal jurisdiction would be "constitutionally reasonable." *Nolan*, 259 F.3d at 216 (internal quotation marks omitted); *accord New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 295 (4th Cir.2005) (applying three-prong test).

In *Consulting Engineers Corp.*, 561 F.3d at 278–82, the plaintiff's tort claims against one defendant were based on that defendant's alleged conspiracy with the other defendant to hire plaintiff's employee. The contacts supporting that plaintiff's assertion of jurisdiction were telephone calls and emails between plaintiff and defendant, rather than communications between the two defendants—which would be more analogous to the alleged grounds for juris-

diction here. Nonetheless, the Fourth Circuit's analysis as to the absence of plaintiff-defendant contacts there is instructive in the present case to show the absence of efforts by the Third Party Defendants to do business in Virginia. Looking at the Fourth Circuit's analysis, the Court notes that the record here reflects no evidence that the Third Party Defendants: 1) had offices or employees in Virginia; 2) owned property in Virginia; 3) had on-going business activity in Virginia; or 4) had any in-person contact with Noble in Virginia. *Id.*

Furthermore, the alleged conspiratorial activity in *Consulting Engineers Corp.* took place outside Virginia "between two non-Virginia corporations." *Id.* While Noble has alleged that some conspiratorial activity aimed at it took place in Virginia, it has not placed evidence before the Court that such alleged conspiracy was aimed at it versus another entity. Indeed, the evidence reviewed above strongly suggests that the alleged conspiracy was aimed at other entities. Additionally, like the alleged conspiracy in *Consulting Engineers Corp.*, the conspiracy alleged here is between two non-Virginia corporations/entities/persons.

On this record, the Court is incapable of finding that the Third Party Defendants have availed themselves of the privilege of conducting activities in Virginia sufficient to justify the exercise of personal jurisdic-

in deposition testimony provided to the Court by Noble, Ratto denied that she conspired "with MIZ Engineering to put Noble Locks out of business" and also denied "conspiring with MIZ Engineering to set up Alex and Meir Avganim to destroy the Noble Locks business." (Ratto Dep. 1197:4–22 and 1200:17–1201:12, Noble Supp. Brief Ex. 5, Docket No. 166.) In her deposition testimony, Kane also implicitly denied the existence of a conspiracy when she affirmatively denied "taking part in any activities to try and get Mr. Avganim sued by MIZ Engineering or have his company put

out of business." (Kane Dep. 984:1–12, Noble Supp. Brief Ex. 10, Docket No. 166.) While the emails referenced above call such denials into question, Noble seemingly seeks to take advantage of the confusion regarding the referenced entities, particularly as it relates to the conspiracy allegation. However, the above deposition excerpts were provided by Noble as part of its evidence, and if Noble wishes some of the excerpts to be used as evidence of a conspiracy, other excerpts must also be considered by the Court as denying the existence of a conspiracy.

tion. Therefore, Noble has not satisfied the first prong of the due process test. Noble has the burden of proving personal jurisdiction by a preponderance of the evidence, which it has failed to do after being given the opportunity to conduct discovery to make its jurisdiction case. Even if Noble had shown that the Third Party Defendants had purposefully availed themselves of the privilege of conducting activities in Virginia (which Noble has not done), it certainly has failed to show that its claims arise out of those activities directed at Virginia since it cannot show that it was the target of the alleged conspiracy. *Cf. Mylan Labs., Inc.*, 2 F.3d 56.[16] Therefore, Noble has not satisfied the second prong of the due process test.

The Court cannot blindly engage in the personal jurisdiction analysis, particularly a due process inquiry, without being provided with sufficient facts. Having failed to satisfy the first and second prongs of the due process test, like the facts in *Consulting Engineers Corp.*, the contacts of the Third Party Defendants with Virginia were "simply too attenuated to justify the exercise of personal jurisdiction."[17] *Con-*

*sulting Engineers Corp.*, 561 F.3d at 280–82.

### 3. "equitable grounds" for personal jurisdiction

During oral argument, Noble handed to the Court and opposing counsel a sheet of paper titled "Personal Jurisdiction Argument Outline" purportedly summarizing its arguments in favor of personal jurisdiction. This paper was not submitted as a brief or evidence and was not made part of the record. In the paper, Noble stated in bullet form several of what it calls "equitable grounds" in arguing that the Third Party Defendants should not be dismissed from this suit for lack of personal jurisdiction. Noble has provided no case law to support its arguments that equitable grounds may serve as the *sole* basis for personal jurisdiction. In addition, none of these arguments have any merit. While the Court need not analyze any such grounds, since Noble has failed to satisfy the first or second prong, the Court will address the so-called equitable grounds because it is not altogether clear for what purpose they are being offered.[18]

---

16. In *Mylan Labs., Inc.*, the Fourth Circuit found that the district court properly looked to both the plaintiff and defendant's proffered proof in ruling on the motion to dismiss for lack of personal jurisdiction. 2 F.3d at 62. The plaintiff was required to show proof of personal jurisdiction by the prima facie standard. *Id.* at 60. The Fourth Circuit agreed with the district court that an alleged parent-subsidiary relationship between two companies was insufficient to pierce the corporate veil and to justify the exercise of personal jurisdiction where the plaintiff produced no persuasive evidence to counter the representation that the two companies were autonomous corporations whose operations, management, and finances were independent. *Id.* at 62–63. Noble has not shown that it was the target of the alleged conspiracy. Furthermore, Noble's own corporate representative has stated that NLEI and Noble are independent companies, and no other evidence has

been provided regarding the relationship between NLEI and Noble, or Noble and any of the other entities. Any evidence provided by Noble of a conspiracy against NLEI would be insufficient for a finding of personal jurisdiction because, based on *Mylan Labs., Inc.*, there is an insufficient case when the plaintiff has not established a sufficient record to show the control necessary to attribute the actions of a subsidiary corporation to the foreign parent corporation.

17. Because Noble has failed to satisfy the first or second prongs of the specific jurisdiction test, the Court need not analyze the remaining prong. *Consulting Engineers Corp.*, 561 F.3d at 281 n. 9.

18. Perhaps Noble offers these equitable grounds for consideration under the third prong of the specific personal jurisdiction test, though that is less than clear.

First, Noble asserts that Ratto and Kane are represented by an "insurance attorney and policy" and therefore will not be "out of pocket" regardless of how the Court resolves these motions. The Court fails to see the relevance of this argument. How the Third Party Defendants' attorney is paid has absolutely no bearing on personal jurisdiction. Third Party Defendants' counsel represents the interests of Ratto, Kane, and JRM, regardless of whether counsel is paid directly by the parties or some other entity.

Second, Noble suggests that if the Court grants these motions to dismiss for lack of personal jurisdiction, there will be two parallel and identical lawsuits in the federal courts. The first would be the current suit here in Virginia against MIZ and Lu, and the second suit would be against the Third Party Defendants in California. Both suits would allegedly involve the same claims. While the Court appreciates Noble's concern for judicial economy, the Court simply cannot find personal jurisdiction on that basis where none exists otherwise. Unless the Third Party Defendants have waived personal jurisdiction, which they most certainly have not done as evidenced by this protracted dispute, numerous briefs, discovery, exhibits, and oral argument in this case, the Court must decide these motions on their merits regardless of whether it may cause a suit to be filed in a different jurisdiction.

Third, Noble argues that a judgment against JRM would still be binding as to Ratto and Kane because they are "in privity" with any decision here based on the alleged theft of the '203 patent and the alleged joint enterprise between MIZ, Lu, Ratto and Kane to enforce the allegedly stolen patent against Noble and its related companies. Again, this Court is not persuaded that the argument is relevant to personal jurisdiction over the parties.

JRM is a separate entity from Ratto and Kane. As discussed above, each defendant's actions are evaluated independently in determining whether that defendant is subject to personal jurisdiction.

Because the contacts in this case were too attenuated and insubstantial to provide a constitutionally sufficient basis for Virginia courts to exercise either general or specific personal jurisdiction over the Third Party Defendants, this Court cannot exercise personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(1)(A).

### C. Analysis of personal jurisdiction pursuant to federal statute

■ Although the Court concludes that personal jurisdiction may not be exercised over the Third Party Defendants under Federal Rule of Civil Procedure 4(k)(1)(A) because Virginia could not assert such jurisdiction, there is an alternative basis for personal jurisdiction in the federal RICO statute, 18 U.S.C. § 1965(b). Federal Rule of Civil Procedure 4(k)(1)(C), which was formerly denominated as Rule 4(k)(1)(D), recognizes the exercise of such jurisdiction by providing that service of a suit is effective to provide personal jurisdiction "when authorized by a statute of the United States." Fed.R.Civ.P. 4(k)(1)(C). Here, a federal statute (RICO) does authorize such service.

#### 1. positions of the parties

The Court held an on-the-record telephonic hearing on April 1, 2009 to address the effect of the *ESAB Group, Inc.* opinion on the personal jurisdiction motions. At that time, the Third Party Defendants argued that: 1) Noble waived its right to argue that the Court has personal jurisdiction pursuant to the RICO statute because such argument was not previously raised, 2) RICO requires that defendants "transact business" in a forum before they can be subject to personal jurisdiction of the

courts in that forum, citing to *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, (2nd Cir.1998), 3) personal jurisdiction can exist only where the "ends of justice" so require, citing again to *PT United Can Co.*, and 4) Noble cannot satisfy the Fifth Amendment due process requirements that apply to personal jurisdiction analysis of a federal statute. Noble responded that this is a legal argument that cannot be waived, that *ESAB Group, Inc.* precludes the second and third of the Third Party Defendants' arguments, and that it can satisfy the Fifth Amendment due process requirements for personal jurisdiction.

The Court will first address Third Party Defendants' waiver argument. The "transact business" and "ends of justice" arguments made by the Third Party Defendants are addressed in the RICO discussion, and the Fifth Amendment argument is addressed in the section so denominated.

### 2. waiver

Although Noble has alleged a RICO violation as one of its claims, Noble did not argue in its brief or at the initial oral argument that the provisions of RICO formed the basis for personal jurisdiction. During oral argument, counsel for the Third Party Defendants argued that Noble waived any argument that *ESAB Group* provides a basis for personal jurisdiction based on the RICO claim because Noble did not address the issue previously.

 First, the Court notes that it may consider a federal statute as a basis for jurisdiction, even though a plaintiff "did not specifically raise it in his pleadings to sustain personal jurisdiction." *D'Addario v. Geller*, 264 F.Supp.2d 367, 390 n. 29 (E.D.Va.2003) (citing 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1067.6, at 563 (3d ed.2002) (hereinafter "Wright & Miller")

(collecting cases and noting that "strictly speaking, under Federal Rule 8(a) plaintiffs are not required to plead the basis for personal jurisdiction over defendants.")). Second, another court in this District has addressed, *sua sponte*, the issue of personal jurisdiction in a federal question case. *See Weinstein v. Todd Marine Enters., Inc.*, 115 F.Supp.2d 668, 670–71 (E.D.Va. 2000). Like the *Weinstein* court, this Court has the discretion to hear the parties' arguments regarding personal jurisdiction based on the RICO claim, even though it was not raised earlier. *See Floyd v. Floyd*, 198 F.3d 237, 1999 WL 812315, at *3 (4th Cir.2000) (unpublished table decision) ("While parties generally waive an argument when they fail to raise it in a timely manner, a trial court's exercise of its discretion to hear the argument anyway may preserve it for appellate review."). Third, counsel had an opportunity for oral argument regarding the RICO claim and its effect on personal jurisdiction over the Third Party Defendants. Counsel for both Noble and the Third Party Defendants opted to rely upon their oral argument rather than briefing this issue. (Hr'g Tr. 32, April 1, 2009, Docket No. 180). Therefore, having heard oral argument on this matter, the Court has elected to exercise its discretion and address the exercise of personal jurisdiction based on the RICO claim, although such argument was not made in the parties' briefs.

### 3. RICO claim

As the Fourth Circuit explained in *ESAB Group, Inc.*, 126 F.3d at 626, Congress enacted RICO as Title IX of the Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922 (1970), *reprinted in* 1970 U.S.C.C.A.N. 1073. RICO prohibits various activities generally associated with organized crime. *See* 18 U.S.C. §§ 1963, 1964. While the statute

provides criminal penalties, *see* 18 U.S.C. § 1963, Congress also "granted a private civil right of action to '[a]ny person injured in his business or property by reason of a violation of' the RICO provisions." *ESAB Group, Inc.*, 126 F.3d at 626 (citing 18 U.S.C. § 1964(c)).

The various Circuit Courts of Appeal agree that RICO provides for nationwide service of process, but they are split on which subsection provides for such service. *Compare ESAB Group, Inc.* 126 F.3d at 626 (finding the nationwide service of process provision in subsection (d)), *and Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir.1997) (finding that "[s]ection 1965(d) of the RICO statute provides for ... nationwide service of process."), *with PT United Can Co.*, 138 F.3d at 71–72 (finding that subsection 1965(b) provides for nationwide service of process and that this conclusion is "borne out by a complete reading of the statute, a course of action which has not been followed by the courts that have read § 1965(d) in isolation to reach the opposite conclusion").

The Court notes that 18 U.S.C. § 1965(a) provides that "any [RICO] civil action against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs." Although the Second Circuit interprets this subsection to mean that "a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant," *PT United Can Co.*, 138 F.3d at 71, in *ESAB Group, Inc.* the Fourth Circuit interpreted subsection (a) as a provision au-

thorizing venue, and looks to subsection (d) for personal jurisdiction. *ESAB Group, Inc.*, 126 F.3d at 626.

In *ESAB Group, Inc.*, 126 F.3d at 626, the Fourth Circuit concluded that it is 18 U.S.C. § 1965(d) that authorizes nationwide service of process and, therefore, the exercise of personal jurisdiction in any district court of the United States.[19] Since service of process was accomplished on the defendants where they were found in the *ESAB Group, Inc.* case, the Fourth Circuit found that personal jurisdiction was established under section 1965(d). The Court said that " 'where,' as here, 'Congress has authorized nationwide service of process ... so long as the assertion of jurisdiction over the defendant is compatible with due process, the service of process is sufficient to establish the jurisdiction of the federal court over the person of the defendant.' " *Id.* at 626. Because of this nationwide service of process provision, "personal jurisdiction may be asserted over a defendant anywhere in the country." *Id.* at 628. As the court said in *Sadighi v. Daghighfekr*, 36 F.Supp.2d 267, 274 (D.S.C.1999), "[b]y reading subsection (d) as providing nationwide service of process, and thus bypassing the restrictive language of subsection (b), the Fourth Circuit has permitted RICO plaintiffs to sue all Defendants in one forum without any need for a showing that the 'ends of justice' required such an assertion of personal jurisdiction over nonresident defendants." "Therefore, the 'ends of justice' analysis of subsection (b) has no place in this court's determination of personal jurisdiction." *Id.*; *D'Addario*, 264 F.Supp.2d at 386 n. 22 ("the Fourth Circuit seems to have eradicated the 'ends of justice' inquiry by using section 1964(d)

---

**19.** 18 U.S.C. § 1965(d) provides that "[a]ll other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such

person resides, is found, has an agent, or transacts his affairs." In this case, the Third Party Defendants have not challenged service under this provision.

to acquire personal jurisdiction"). Accordingly, "so long as the federal claim is not wholly immaterial or insubstantial," *ESAB Group, Inc.,* 126 F.3d at 629, "[s]ervice of process is sufficient to establish a federal court's exercise of jurisdiction over the [RICO] defendant as long as the assertion of jurisdiction comports with due process." *D'Addario,* at 387.

### 4. colorable claim

In *ESAB Group, Inc.,* the Fourth Circuit stated, in concluding the opinion, that "[s]ince the court has personal jurisdiction over the defendants under service of process authorized by the Federal Rule of Civil Procedure 4(k)(1)(D) [20] and by the RICO statute, we can find no constitutional bar to requiring the defendants to defend the entire constitutional case, which includes both federal and state claims arising from the same nucleus of operative facts, *so long as the federal claim is not wholly immaterial or insubstantial.*" *ESAB Group, Inc.,* 126 F.3d at 629 (emphasis added) (citing *Republic of Panama,* 119 F.3d at 942, 951 & n. 26). Because *Republic of Panama* was cited for the italicized proposition, the Court will examine that case for further elucidation.

In *Republic of Panama,* the Eleventh Circuit was faced with both Fed.R.Civ.P. 12(b)(2) and 12(b)(6) motions in a RICO case. *Republic of Panama,* 119 F.3d at 941–42. After noting that the defendants argued there was no need to reach the Fifth Amendment due process claim because plaintiff Panama failed to state a RICO claim, and that defendants had waived such argument by failing to raise it before the district court, the Eleventh Circuit stated that it would nevertheless consider the claim "only to clarify the distinction between what a plaintiff asserting jurisdiction under a federal statute must allege to survive a defendant's 12(b)(1) or 12(b)(2) motion on the one hand, and a defendant's 12(b)(6) motion on the other." *Id.* at 941.

The *Republic of Panama* court apparently resolved the issue of which matter should come first by deciding to address subject matter jurisdiction first (Fed. R.Civ.P. 12(b)(1)), personal jurisdiction second (Fed.R.Civ.P. 12(b)(2)), and the dismissal on the merits third (Fed.R.Civ.P. 12(b)(6)).[21] Turning to the issue of subject matter jurisdiction, the Eleventh Circuit then stated that "[w]hen a jurisdictional motion to dismiss depends, as in this case, on the assertion of a right created by a federal statute, the court should dismiss for lack of jurisdiction only if the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit as not to involve a federal controversy." *Id.* (internal citations and quotations omitted). If the claim survives this standard, it is "colorable" and should not be dismissed on such grounds. *Id.* at 942; *D'Addarrio,* 264 F.Supp.2d at 388 ("[t]o defeat plaintiff's use of the nationwide service of process provision, the [defendants] must meet the high burden of establishing that plaintiff's RICO claim against them is not colorable, i.e., that it is implausible, insubstantial, or frivolous"), *Sadighi,* 36 F.Supp.2d at 271 (defendants "must meet the high

---

**20.** Former Federal Rule of Civil Procedure 4(k)(1)(D) is now enumerated as 4(k)(1)(C).

**21.** Since "federal courts, being of limited jurisdiction, must examine their subject-matter jurisdiction 'throughout the pendency of every matter before them,' " *Holloway v. Brush,* 220 F.3d 767, 781 (6th Cir.2000), it is understandable that the *Republic of Panama* court should conclude (though they never explicitly stated such) that subject matter jurisdiction should be addressed first—apparently whether there is a pending Fed.R.Civ.P. 12(b)(1) motion or not.

burden of demonstrating that Plaintiffs' RICO claim is not colorable, that is, the RICO claim is so insubstantial, implausible, . . . or otherwise devoid of merit as to deprive [Plaintiffs] of the right to utilize RICO's nationwide service of process provision") (internal quotations omitted). Discussing in another context the standard by which a court determines whether a claim is "colorable," the Fourth Circuit has noted in an ERISA case, that "[a] claim is colorable if it is arguable and nonfrivolous, whether or not it would succeed on the merits." *Davis v. Featherstone*, 97 F.3d 734, 737–38 (4th Cir.1996).[22]

■■■■■■■ A plaintiff must plead all the elements of a violation under 18 U.S.C. § 1962 in order to state a civil claim under 1964(c). *Sedima, S.P.R.L. v. Imrex, Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Therefore, the third party plaintiff must carry its burden to show 1) conduct, 2) of an enterprise, 3) through a pattern, 4) of racketeering activity. *Id.* The third party plaintiff must also show that 5) he was injured in his business or property, 6) by reason of the RICO violation. *Id.* at 496–97, 105 S.Ct. 3275. "These two additional elements are viewed as standing requirements," *D'Addarrio*, 264 F.Supp.2d at 388 (citing *Sedima*, 473 U.S. at 496–97, 105 S.Ct. 3275); both but-for and legal cause must be shown.

*Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).[23] Furthermore, in the RICO context, the "pertinent inquiry in determining the existence of proximate, or 'legal' cause, is 'whether the conduct has been so significant and important a cause that the defendant should be held responsible.'" *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir.1996).

Without holding an evidentiary hearing, Judge Kelley previously considered, and denied, the Third Party Defendants' Fed. R.Civ.P. 12(b)(6) motion to dismiss Noble's RICO count (Count VII), specifically addressing RICO elements one through four. (Order, Sept. 28, 2007, Docket No. 146 at 12–17.) However, elements five and six, the standing requirements, were not addressed in that opinion. Nonetheless, as discussed above, they are necessary components of subject matter jurisdiction which must be examined to assure that the third party plaintiff's RICO "claim is not wholly immaterial or insubstantial." *ESAB Group, Inc.*, 126 F.3d at 629.

■■■■■■ Before examining the record to satisfy the standing requirement, the Court must consider what standard to apply. The Fourth Circuit recently examined this inquiry in the context of subject

---

**22.** In *Republic of Panama*, 119 F.3d at 941, the Eleventh Circuit cited *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir.1993), concluding that plaintiff had asserted a colorable claim under a federal statute and was therefore entitled to take advantage of that statute's nationwide service of process provision. The *Herrmann* court also first decided that it had personal jurisdiction before addressing defendants' motion to dismiss for failure to state a claim, and distinguishing between the "colorable federal claim" standard for the first issue, and the "federal claim upon which relief can be granted" standard for the second issue. *Id.* at 1057.

**23.** Since the requirement in *ESAB Group, Inc.* that a claim not be "wholly immaterial or insubstantial" is merely a method of expressing the necessity that a court have subject matter jurisdiction, it makes perfect sense that standing should be examined along with the other elements of a RICO claim since standing is a necessary core component of subject matter jurisdiction. *Marshall v. Meadows*, 105 F.3d 904, 906 (4th Cir.1997) (citing *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) for proposition that standing is a necessary core component of subject matter jurisdiction).

matter jurisdiction, of which standing is a component.

Where, as here, a defendant challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence. *See Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982) ("The burden of proving subject matter jurisdiction on a motion to dismiss is on the plaintiff, the party asserting jurisdiction."). Unless "the jurisdictional facts are intertwined with the facts central to the merits of the dispute," the district court may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits. *Id.; see also Arbaugh,* 546 U.S. at 514, 126 S.Ct. 1235 ("[I]n some instances, if subject-matter jurisdiction turns on contested facts, the trial judge may be authorized to review the evidence and resolve the dispute on her own. If satisfaction of an essential element of a claim for relief is at issue, however, the jury is the proper trier of contested facts.") (internal citations omitted)....

*United States ex rel. Vuyyuru v. Jadhav,* 555 F.3d 337, 347–48 (4th Cir.2009). As discussed above, the parties have stipulated that the Court should consider their personal jurisdiction motions, and the evidence submitted, as if an evidentiary hearing had taken place and apply a preponderance of the evidence standard. However, the requirement that the "claim is not wholly immaterial or insubstantial" is a subject matter jurisdiction requirement, and even if there is evidence in the record outside the pleadings where "the jurisdictional facts are intertwined with the facts central to the

merits of the dispute," the district court may not go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings. *Id.; see Augustine v. United States,* 704 F.2d 1074, 1077 (9th Cir.1983) (when ruling on subject matter jurisdiction a court is ordinarily free to hear evidence before trial and resolve factual disputes unless jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits—in which case jurisdictional determination should await determination of the relevant facts on either a motion going to the merits or at trial).

It is RICO element five (proof that plaintiff was injured in his business or property) that brings the Court back to the same point addressed above in the Fourteenth Amendment due process analysis where the Court concluded that Noble had failed to show that it was the target of the alleged conspiracy. Logic dictates that whether "[Noble] was injured in [its] business or property" (element five of RICO violation), so as to prove that its claim is not wholly immaterial or insubstantial, is intertwined with whether Noble has shown that *it* was the target of the alleged conspiracy, *i.e.,* the substantive issue. *Vuyyuru,* 555 F.3d at 349. Therefore, even though the parties have stipulated that the Court can consider the personal jurisdiction motions as if an evidentiary hearing had taken place, the Court cannot go beyond the allegations of the Third Party Complaint and resolve the factual subject matter jurisdiction issue of standing by considering evidence outside the pleadings.[24] Since Judge Kel-

---

24. As explained above, for purposes of standing, the Court cannot consider the existing

record as if an evidentiary hearing had taken place. However, the Court notes that if such

ley has already examined elements one through four of the RICO claim asserted by Noble and denied the motions to dismiss, this Court need only compare elements five and six of the RICO claim to the allegations of the Third Party Complaint.

In Count VII of its Third Party Complaint, Noble alleged that it was injured in its business by stating that: "due to the purposefully injurious conduct ... [Noble] [has] been intentionally and irreparably harmed." (Third Party Compl. ¶ 195, Docket No. 91.) That alleged injury was attributed to the RICO violation because Noble alleged that: "Third Party Defendants have successfully conducted a business enterprise to injure [Noble's] business through a pattern of racketeering activity." (*Id.* at. ¶ 187.) Therefore, Noble has sufficiently alleged subject matter jurisdiction such that the RICO claim cannot be said to be "wholly insubstantial and immaterial." *ESAB Group, Inc.,* 126 F.3d at 629.

### 5. constitutional due process

 Having determined that service of process was accomplished on the Third Party Defendants pursuant to 18 U.S.C. § 1965(d), and having determined that Noble has stated a "colorable" RICO claim, the Court must determine whether the assertion of personal jurisdiction under RICO is compatible with due process. *Id.* at 626. Unlike the assertion of jurisdiction under the state long-arm statute, where due process concerns are addressed under

the Fourteenth Amendment's due process clause, assertion of jurisdiction under a federal statute pursuant to Federal Rule of Civil Procedure 4(k)(1)(C) requires application of the due process clause of the Fifth Amendment. *Id.* at 626–27; *Sadighi,* 36 F.Supp.2d at 274; *R.J. Reynolds Tobacco Co. v. Mkt. Basket Food Stores, Inc.,* No. 5:05CV253–V, 2006 WL 2417269, *4, 2006 U.S. Dist. LEXIS 59492, at *11–12 (W.D.N.C. Aug. 21, 2006) (relying on former Fed.R.Civ.P. 4(k)(1)(D), which has been renumbered as 4(k)(1)(C)); *In re Long v. Alexander & Alexander Servs., Inc.,* 680 F.Supp. 746, 750–51 (E.D.N.C. 1988) (Fifth Amendment inquiry asks only whether subjecting defendant to suit in the forum would be unduly burdensome).

The principles governing application of the Fifth Amendment's due process provision were recently summarized in *R.J. Reynolds Tobacco Co. v. Mkt. Basket Food Stores, Inc.,* 2006 WL 2417269, *3, 2006 U.S. Dist. LEXIS 59492, at *12: [25]

> The Fifth Amendment's Due Process Clause limits the extraterritorial scope of *federal* sovereign power whereas the Fourteenth Amendment's Due Process Clause protects *states* in their status as equal sovereigns. *ESAB Group,* 126 F.3d at 626–27 (internal citations omitted); *Boon Partners, v. Advanced Fin. Concepts, Inc.,* 917 F.Supp. 392, 397 (E.D.N.C.1996) (no need to examine fairness of litigation proceeding with respect to a particular state under Fifth Amendment because encroachment by

consideration was possible, on this record, Noble would not be able to satisfy element five and show that it was injured by the alleged conspiracy—as the Court already explained in its consideration of the Fourth Amendment due process above. *See Saudi v. Northrop Grumman Corp.,* 427 F.3d 271, 276–77 (4th Cir.2005) (on personal jurisdiction motion, plaintiff provided no evidence defendant shipyard had anything to do with his

injuries, and no evidence of the relationship between foreign defendant shipyard and shipyard's Texas subsidiary).

**25.** The Fifth Amendment to the United States Constitution provides that "[n]o person shall ... be deprived of life, liberty or property, without due process of law." U.S. Const. amend. V.

one state upon sovereignty of another is not at issue). Not unlike the Fourteenth Amendment, the Fifth Amendment's Due Process Clause also protects the liberty interests of individuals against unfair burden and inconvenience. *Id.* (citing *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 942 (11th Cir.1997)). However, when considering burden and inconvenience factors with respect to a national forum, the constitutional minimum contacts test is more easily satisfied. *ESAB Group,* 126 F.3d at 626–28; *Owens Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.),* 124 F.3d 619, 630 (4th Cir.1997) (minimum contact with the United States); *D'Addario[,* 264 F.Supp.2d at 386] (Fourth Circuit applies national contacts standard when federal law authorizes nationwide service of process). As a result, "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." *Id.* (quoting *Republic of Panama,* 119 F.3d at 947).

These principles provide the backdrop for examination of constitutional due process in this context.

Because the parties do not disagree that Ratto and Kane are California residents, and JRM is a California limited liability company, and since such nationwide contacts would satisfy any general personal jurisdiction test, unless inconvenience rises to a level of constitutional concern, the Court would find that they have minimum contacts with the United States such that subjecting them to personal jurisdiction does not offend the rights protected by the Due Process Clause of the Fifth Amendment. *See In re Celotex,* 124 F.3d at 630 ("Given that [defendant] Rapid is a Delaware corporation with its principal place of business in New York, we have no doubt that [Rapid has minimum contacts with the United States]"). Therefore, the Court must consider whether there is any unfair burden or inconvenience which would "outweigh the Congressional policy of permitting the exercise of personal jurisdiction pursuant to RICO's nationwide service of process provisions." *Sadighi,* 36 F.Supp.2d at 274. This is not one of the "highly unusual cases [where] inconvenience will rise to a level of constitutional concern" *ESAB Group, Inc.,* 126 F.3d at 627 (citing *Republic of Panama,* 119 F.3d at 947) because, as evidenced by the numerous briefs and hearings in this case, Third Party Defendants have demonstrated their ability to defend their interests more than adequately, despite the distant forum. The Court finds that there is no unfair burden or inconvenience to the Third Party Defendants that violates the Due Process Clause of the Fifth Amendment. Therefore, this Court may constitutionally exercise personal jurisdiction over the Third Party Defendants on Noble's RICO claim.

#### 6. pendent personal jurisdiction

Although the Court has personal jurisdiction over the Third Party Defendants to adjudicate the RICO claim because of its authorization for nationwide service of process, the question remains whether that service authorizes the Court to assert personal jurisdiction over the Third Party Defendants to adjudicate the state law claims against them, as well as the Lanham Act claim. *ESAB Group, Inc.,* 126 F.3d at 627.

#### a. state law claims

The question regarding the state law claims was squarely before the Fourth Circuit in *ESAB Group, Inc.,* and that court found that as long as the RICO claim and the state claims arise from a common nucleus of operative facts, a district court has pendent personal jurisdiction to decide

both the federal and the state claims alleged against defendants. *Id.* at 628–29. Here, all of Noble's state law claims arise from the same nucleus of operative facts that also relate to the RICO claim. All of Noble's state law claims involve an alleged effort to damage its business by the same perpetrators, and using similar means, as with the RICO claim. The facts involved in proving the RICO and state claim allegations are so intertwined that it would "impose only a minimal burden [on the Third Party Defendants] to provide a defense on the factually-related state law claim[s]." *Id.* at 628. Therefore, this Court has the authority under the doctrine of pendent personal jurisdiction to decide the RICO and state claims alleged against the Third Party Defendants.

### b. Lanham Act claim

■■■■■ Noble's only remaining claim is for violation of the Lanham Act based upon allegations that the Third Party Defendants engaged in "unfair competition arising under Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)." (Third Party Compl. ¶ 99, Docket No. 91.) That statute does not authorize nationwide service of process. *ISI Intern., Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 550 (7th Cir.2001) (no provision in statute addresses nationwide service); 15 U.S.C. § 1125. Therefore, the Court must determine whether it may, and indeed should, exercise pendent personal jurisdiction over the Third Party Defendants as to Noble's Lanham Act claim.

"Pendent personal jurisdiction, like its better known cousin, supplemental subject matter jurisdiction, exists when a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal

jurisdiction over the first claim, asserts personal jurisdiction over the second claim." *United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir.2002) (citing generally 4A Wright & Miller, *Federal Practice & Procedure* § 1069.7 (3d ed.2002)). As the Tenth Circuit noted in *Botefuhr*, "[i]n essence, once a district court has personal jurisdiction over a defendant for one claim, it may 'piggyback' onto that claim other claims over which it lacks independent personal jurisdiction, provided that all the claims arise from the same facts as the claim over which it has proper personal jurisdiction." *Id.*

The *Botefuhr* court also examined the general origin of the pendent personal jurisdiction concept:

> The concept of pendent personal jurisdiction traces its origins to "federal question cases where state law claims were tacked onto federal causes of action under pendent [or supplemental] subject matter jurisdiction." [FN 7] *Id.* at 144. Though

---

[FN 7] ... We adopt the modern approach of referring to "pendent subject matter jurisdiction" as "supplemental subject matter jurisdiction." Because, however, pendent personal jurisdiction remains a court-created creature that has not yet been sanctioned by Congress, we will use the term pendent when referring to it. *See* 4A Wright & Miller, *supra*, § 1069.7, at 227 (referring to pendent personal jurisdiction as supplemental subject matter jurisdiction because only the latter has been statutorily authorized).

originally a court-created concept, Congress later endorsed and codified the concept of supplemental subject matter jurisdiction. *See* 28 U.S.C. § 1367(a) ("The district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the

United States Constitution."). By contrast, pendent personal jurisdiction is not explicitly authorized by statute and remains, at least in the view of most commentators, "a federal common law doctrine." 4A Miller & Wright, *supra*, § 1069.7, at 227 (arguing that § 1367 cannot be read as authorizing pendent personal jurisdiction and explaining that the concept "must be properly understood to be a federal common law doctrine").

*Id.* at 1272–73.

While the Fourth Circuit has specifically approved the application of pendent personal jurisdiction over state law claims arising from a common nucleus of operative facts, this Court is not aware of any case where the Fourth Circuit has approved the application of pendent personal jurisdiction over a *federal* claim. *ESAB Group, Inc.*, 126 F.3d at 628–29. Although the *Botefuhr* court did not ultimately apply pendent personal jurisdiction over the related federal claim before it because the anchor federal claim had been dismissed, the court did conclude that it otherwise would have the authority to exercise pendent personal jurisdiction over the parties involved in the related federal claim. *Botefuhr*, 309 F.3d at 1273 ("we agree that where claims 'arise from the same common nucleus of operative fact' 'the inconvenience to a defendant . . . is not [necessarily] sufficient to dismiss . . . for lack of personal jurisdiction.' 4A Wright & Miller, *supra*, § 1069.7, at 228."). Other courts have reached a similar conclusion. For example, in *Rolls–Royce Corp. v. Heros, Inc.*, 576 F.Supp.2d 765, 783–84 (N.D.Tex.2008), the court confronted this question specifically with regard to the

Lanham Act. That court had personal jurisdiction based on RICO and was faced with deciding whether to exercise pendent personal jurisdiction over those parties before it on a Lanham Act claim. *Id.* After analyzing the existing authorities, the *Rolls–Royce* court concluded that "if Rolls–Royce's remaining claims arise out of the same nucleus of operative fact as its RICO claims, it is within the court's discretion to exercise pendent personal jurisdiction over them." *Id.* However, the *Rolls–Royce* court ultimately determined that the Lanham Act claim "[did] not arise out of the same nucleus of operative fact as the RICO claims" and that it "lack[ed] authority to exercise pendent personal jurisdiction over defendants as to Rolls–Royce's Lanham Act claim." *Id.*[26]

█ This Court has closely examined the pendent personal jurisdiction holding in *ESAB Group, Inc.*, 126 F.3d at 628. In concluding that the district court had pendent personal jurisdiction over the related state claims, the Fourth Circuit framed the question as follows: "If a case includes a claim brought under a federal statute authorizing a nationwide service of process and another claim *under a statute* or under state law for which nationwide service of process is not available, does the court have personal jurisdiction over the defendant to adjudicate the entire case?" *Id.* (emphasis added). Although the Fourth Circuit was addressing the question of whether there was pendent personal jurisdiction over state claims, it did not so limit the question—specifically referring to "another claim under a statute or under state law." *Id.* It is difficult to know whether the Fourth Circuit in *ESAB Group, Inc.*

---

**26.** In researching this issue, several other cases were discovered that applied pendent personal jurisdiction to related federal claims. However, because it is less than clear whether some courts have used the concept of pendent

personal jurisdiction interchangeably with the related, but different, concept of pendent (now known as supplemental) subject matter jurisdiction, the Court has not included additional citations here.

was suggesting that the analysis is no different whether the additional claim is a state claim or a federal claim. However, as far as this Court is concerned, the Fourth Circuit's rationale for applying pendent personal jurisdiction to the state claims is no different than it would be for applying such jurisdiction to an additional federal claim. As they noted:

When a federal statute authorizes a federal district court to exercise personal jurisdiction over a defendant beyond the borders of the district and the defendant is effectively brought before the court, we can find little reason not to authorize the court to adjudicate a state claim properly within the court's subject matter jurisdiction so long as the facts of the federal and state claims arise from a common nucleus of operative fact. The defendant will have to adjudicate the facts of the federal claim, and it could impose only a minimal burden to require the defendant to provide a defense on the factually-related state claim. We agree with the observation that

judicial economy and convenience of the parties is best facilitated by a consideration of all legal theories arising from a single set of operative facts.... Once that set of facts and defendants are legitimately before the court ... little would be gained by not requiring a defendant to defend against a certain type of theory superimposed upon those facts.

*Id.* (citations omitted). Accordingly, this Court concludes that the Fourth Circuit has approved the exercise of pendent personal jurisdiction over claims arising from a common nucleus of operative fact, whether the additional claim is a state claim or a federal claim.

Although the Court has decided that it has the authority to exercise pendent personal jurisdiction over the Lanham Act claim, the Court must still exercise its discretion to decide whether to take personal jurisdiction over the Third Party Defendants for such Lanham Act claim. *Botefuhr*, 309 F.3d at 1273 ("[o]f course, even where a court could legally exercise pendent personal jurisdiction over a claim, a district court retains discretion"). The Court finds that judicial economy and convenience of the parties is best facilitated by consideration of all legal theories arising from the single set of operative facts before the Court, including the Lanham Act claim, and exercises its discretion to consider the Lanham Act claim along with the related RICO claim and state law claims (1) because the RICO statute authorizes this Court to exercise personal jurisdiction over the Third Party Defendants, (2) because the Lanham Act claim and the RICO claim arise from a common nucleus of operative facts, and (3) because litigating the Lanham Act claim alone in another jurisdiction does not promote judicial economy. *Id.*

### III. Conclusion

For the above reasons, the Motion to Dismiss filed by De Martinis is **GRANTED** as to all claims. The Motions to Dismiss filed by Ratto, Kane, and JRM are **DENIED** as to all claims. The Clerk is **REQUESTED** to forward a copy of this Order to all counsel of record. Counsel are **DIRECTED** to contact the courtroom deputy at (757) 222–7213 to schedule the remaining issues for a Rule 16(b) scheduling conference, settlement conference, and trial.

**IT IS SO ORDERED.**